[S. F. No. 13549. In Bank.—August 11, 1932.]

J. H. GARRETT et al., Appellants, v. F. W. SWANTON, as Mayor, etc., et al., Respondents.

J. L. Johnston and Maurice J. Rankin for Appellants.

John H. Leonard, Carl E. Lindsay, Maurice R. Carey and Carey & Gorfinkel for Respondents.

Orrick, Palmer & Dahlquist, Gibson, Dunn & Crutcher and H. F. Prince, *Amici Curiae.*

THE COURT.—This action was instituted in the court below by plaintiffs as taxpayers and residents of the city of Santa Cruz. Plaintiffs prayed for a decree directing the delivery into court, for the purpose of cancellation, of a certain contract between the city and Fairbanks, Morse & Co., a corporation; for an injunction preventing the city from making any further payments under the contract, and preventing the defendant city officials from auditing, allowing or approving any demand or claim based thereon; and for a decree requiring the defendants to repay to the city the sum of $30,000 already paid under the contract. Subsequently the plaintiffs filed an amendment to the complaint, which amendment merely set out with more . particularity the transaction which is the basis of this suit. Defendants demurred generally and specially, which

demurrers were sustained without leave to amend. Plaintiffs subsequently moved for leave to amend, but this motion was denied on the ground that the complaint as amended could not be further amended so as to state a cause of action. Judgment was thereupon rendered in favor of defendants and from this judgment plaintiffs have prosecuted this appeal.

Appellants' main contention is that the contract in question violates article XI, section 18, of the state Constitution. In this contention they are assisted by several *amici curiae.* So far as pertinent here, article XI, section 18, provides:

"No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner, or for any purpose, exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose."

It is alleged by the plaintiffs that the contract here involved creates an indebtedness or liability in excess of that allowed by the above provision, and that the incurring of such indebtedness or liability was not authorized by a vote of the electors of Santa Cruz. It is admitted by respondents that no such election was had.

The contract in question is pleaded as an exhibit to the complaint, and provides that the respondent Fairbanks, Morse & Co. agrees to install a pumping plant for the city at a total cost of $152,960. The complaint alleges that at the time this contract was entered into the city already owned and operated a water system plant supplying water to the inhabitants of the city; that this water distributing system was acquired by the sale of bonds; that the amount of the bonded indebtedness of the city incurred for the purpose of acquiring and maintaining this water system now outstanding is $555,000; that said outstanding indebtedness constitutes a general obligation of the city. It appears from the complaint that in March, 1928, the city council of Santa Cruz by resolution indorsed a plan to acquire a pumping plant to be operated in connection with the existing distributing system. On April 30, 1928, pursuant to a resolution of the council, the city clerk advertised for bids for the pumping plant, said plant to be constructed in accordance with the plans and specifications furnished by

the city. This notice provided that the terms of purchase and the time and amount of payments were left to the bidders. It appears that the California Filter Company submitted the lowest bid, but such bid was not accepted for the reason that it called for cash. Respondent Fairbanks, Morse & Co. submitted the bid which was subsequently accepted by the council, and made the basis of the contract involved in this action. By the terms of this contract, as already stated, Fairbanks, Morse & Co. agreed to install the pumping plant at a total cost of $152,960, "less an allowance of nine thousand dollars ($9000) for the equipment specified" by the city in its notice of bids, "in the event that the municipality can legally transfer or sell said equipment to the company". It was provided that $30,000 in cash was to be paid upon commencement of work, and the balance to be paid in sixty equal monthly installments, commencing September 1, 1928, all the installments to be payable on the presentation of claims at maturity of each respective installment. The contract stated that "it is agreed that the obligation to pay the installments hereunder is not a general obligation of the said municipality payable from taxes or its general funds but only a special obligation payable from the Water Development Fund. . . . The municipality covenants to operate the said [water] department in an efficient and economic manner, and to maintain rates for the product or service of said department which will produce sufficient revenue for the payments called for by this contract so far as it may be permitted to do so by law. The municipality agrees to operate said plant as a municipal plant until all installments to become due under this contract have been fully discharged, and until such time shall not dispose of said plant in any manner so as to deprive the company of its title to or interest in machinery or materials without providing for the payments to the company of all installments when due or to become due under this contract."

The contract also provides that the title and ownership of the machinery and materials installed shall remain in the company and shall retain their character as personal property, until all installments have been paid. It is then provided that "in the event of a breach of any of the terms and provisions herein contained on the part of said

municipality . . . the company shall have and by said municipality is expressly given the right, privilege and option to immediately repossess the machinery, materials and structures herein referred to, in which event the company shall keep and retain any and all installments paid hereunder as and for rental thereof''. The city expressly agrees to insure and pay the taxes on the machinery and equipment during the period of the contract.

The contract above outlined was accepted by the city council on May 14, 1928. On the same day the council determined by resolution that the installation of the pumping plant was an emergency measure for the reason that the existing plant was inadequate. Later the city desired to change the location of the pumping plant. Fairbanks, Morse & Co. agreed to the change providing that the city at its own cost would agree to bear certain expenses connected with the change. This the city agreed to do.

On May 21, 1928, Fairbanks, Morse & Co. presented its claim for $30,000 as and for the cash down payment provided for in the contract. This claim was approved and paid the same day. On May 28, 1928, plaintiffs demanded that the money be repaid, and demanded that the city immediately sue to recover the same. The defendants refused to comply with this request. The original complaint alleges that this sum of $30,000 was paid ''out of the public funds of said city of Santa Cruz.''

Plaintiffs also plead the provisions of Ordinance No. 1287 of the city passed by the council and approved by popular vote in 1923. This ordinance provides that ''the rents, income, and receipts from the water system of the said city shall be used solely and exclusively for the operation, maintenance, construction, improvement, extension, enlargement and upkeep thereof and for the payment and liquidation of the principal and interest of any bonded indebtedness now existing, or which may be hereafter created for the operation, maintenance, construction, improvement, extension, enlargement or upkeep of said water system''.

On information and belief plaintiffs allege that the necessary and requisite expenditures of the city for the fiscal year from July 1, 1927, to July 1, 1928, inclusive of the total obligation of this contract, exceed the income and

revenues of said City of Santa Cruz for said fiscal year. This is conceded to be a fact by respondents.

Essentially the transaction above outlined presents a situation where the city agrees to purchase certain machinery on the conditional sales plan, title to remain in the seller until paid for, and agrees to pay for the same, part in cash and the balance in installments over a period of years, out of a special fund, which fund is created not only by the profits from the property purchased, but contains also the profits earned by the entire water plant of the city. Can a city, when the total amount of such a purchase exceeds its income, enter into such a contract without submitting the same to a vote of the people? Appellants urge that such a contract violates the constitutional provision above quoted.

■ Appellants take the position that when the agreement with Fairbanks, Morse & Co. was entered into on May 14, 1928, an immediate liability for the full amount of the contract price—$152,960—came into existence, and that such liability was a general obligation of the city. There can be no doubt that immediately upon entering into the contract a liability arose for the full purchase price. ■ The law is well settled in this state that installment contracts of any kind, where the installment payments are to be made over a period of years and are to be paid out of the ordinary revenue and income of a city, where each installment is not in payment of the consideration furnished that year, and the total amount of said installments when coupled with the other expenditures exceeds the yearly income, are violative of the constitutional provision in question unless approved by a popular vote. This is so whether the contract be denominated a mortgage, lease, or conditional sale. (*Chester* v. *Carmichael*, 187 Cal. 287 [201 Pac. 925]; *In re City and County of San Francisco*, 195 Cal. 426 [233 Pac. 965]; *Mahoney* v. *San Francisco*, 201 Cal. 248 [257 Pac. 49].)

■ It is true that under the doctrine enunciated in *McBean* v. *City of Fresno*, 112 Cal. 159 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac. 358], *Smilie* v. *Fresno County*, 112 Cal. 311 [44 Pac. 556], *Doland* v. *Clark*, 143 Cal. 176 [76 Pac. 958], *California Pacific Title & Trust Co.* v. *Boyle*, 209 Cal. 398 [287 Pac. 968], contracts for the furnishing of property in the future have been upheld, but only where

no liability or indebtedness came into existence until the consideration was actually furnished. In other words, such contracts are valid where each year's installment is within the city's income, and where each year's payment is for the consideration actually furnished that year. This exception to the general rule is well stated in *McBean* v. *Fresno, supra,* at page 167: ''We base our views upon the conviction that, at the time of entering into the contract, no debt or liability is created for the aggregate amount of the installments to be paid under the contract, but that the sole debt or liability created is that which arises from year to year in separate amounts as the work is performed.'' This exception can have no application to the case at bar for the reason that the liability of the city for the entire contract price came into existence at the time the contract was entered into, and the installments were not to be paid each year for the work to be performed in that year. Keeping in mind at all times the allegation of the complaint that the total expenditures required by this contract, if added to the other expenditures of the city for 1927–1928, will exceed the yearly income, it is apparent that the debt or liability created by this contract, constituting, as it does, an immediate liability of the city, violates the constitutional provision unless that provision does not apply to this type of contract because of the fact that all payments are to be made from the water fund, and are not to constitute a general obligation of the city.

It is the contention of respondents that since by the terms of this contract the indebtedness or liability is made payable solely out of a specified fund created entirely from the income of the water system, and is not a general obligation of the city, the constitutional provision has not been violated. This so-called ''special fund'' doctrine finds ample support in the decisions of other jurisdictions where constitutional debt limit provisions similar to the one here involved, exist. It seems to be the majority rule in other jurisdictions that a limitation upon municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the municipality is not liable to pay the same out of its general funds should the special fund prove to be insufficient, and the transaction by which the indebtedness is incurred cannot in any event deplete the resources of

the municipality. (19 R. C. L. 985, sec. 281; 6 McQuillin, Municipal Corporations, 2d ed., 45, sec. 2387; see, also, *Fox* v. *Bicknell,* 193 Ind. 537 [141 N. E. 222]; *Bowling Green* v. *Kirby,* 220 Ky. 839 [295 S. W. 1004]; *Kelly* v. *Minneapolis,* 63 Minn. 125 [30 L. R. A. 281, 65 N. W. 115]; *Bell* v. *City of Fayette,* 325 Mo. 75 [28 S. W. (2d) 356]; *Kasch* v. *Miller,* 104 Ohio St. 281 [135 N. E. 813]; *McClain* v. *Regents of University,* 124 Or. 629 [265 Pac. 412]; *Barnes* v. *Lehi City,* 74 Utah, 321 [279 Pac. 878]; *State* v. *Clausen,* 134 Wash. 196 [235 Pac. 364]; *Franklin Trust Co.* v. *Loveland,* 3 Fed. (2d) 114.) In *Feil* v. *Coeur d'Alene,* 23 Idaho, 32 [43 L. R. A. (N. S.) 1095, 129 Pac. 643], and *Miller* v. *City of Buhl,* 48 Idaho, 668 [72 A. L. R. 682, 284 Pac. 843], the supreme court of Idaho refused to follow this "special fund" doctrine.

The recent decisions of this court would seem to leave no room for doubt that the "special fund" doctrine has been adopted in this state. In *Shelton* v. *City of Los Angeles,* 206 Cal. 544 [275 Pac. 421], a taxpayer sought to enjoin the city of Los Angeles and the board of water and power commissioners from proceeding with the issuance of certain short-term notes on the ground that the issuance of the notes would violate the constitutional provision here involved. This court held that the constitutional provision was not violated because the notes were not a general obligation of the city, directly or indirectly, but were payable solely and entirely from a special fund. The position taken in the Shelton case has been recently affirmed in the case of *In re California Toll Bridge Authority,* 212 Cal. 298 [298 Pac. 485]. In that case not only was the Shelton case directly affirmed, but at page 302 the court stated: "The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties, political subdivisions, or public agencies by legislative sanction and authority, if such particular bonds or obligations are secured by and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public agency issuing them, within the definiton of 'debts' as used in the constitutional pro-

visions of the states having limitations as to the incurring of indebtedness.''

It therefore follows that if the contract here involved comes within the limits of the ''special fund'' doctrine it does not violate the debt limit provision of the state Constitution. In order to determine this question it is necessary to determine the exact limits and extent of that doctrine. On this phase of the question the decisions of the courts of this state offer no assistance, but in other states this phase of the problem has been frequently considered. ■ An examination of the cases from other jurisdictions establishes the fact that there are at least two well-settled limitations or exceptions to the ''special fund'' doctrine. Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction, a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred.

■ Appellants and *amici curiae* urge that the contract here involved comes within either or both of these exceptions or limitations. With this contention we are. inclined to agree. It is to be noted that the complaint alleges that before this contract was entered into the City of Santa Cruz owned its waterworks system, acquired with money raised from the sale of its own bonds. For a history of the method by which this waterworks system was acquired see *City of Santa Cruz* v. *Wykes*, 202 Fed. 357; *Waite* v. *Santa Cruz*, 184 U. S. 302 [46 L. Ed. 552, 22 Sup. Ct. Rep. 327]. The complaint alleges that part of the bonds by which the waterworks system was acquired are still outstanding, and that such bonds constitute a general obligation of the city. All moneys collected from the operation of the waterworks system are placed in the water development fund. By the terms of Ordinance No. 1287, above quoted, such fund is to be used solely and exclusively for the ''operation, maintenance, construction, improvement, extension, enlargement and upkeep'' of the water system and for the pay-

ment of "any bonded indebtedness now existing or which may be hereafter created for the operation, maintenance, construction", etc., of said water system. It is the fund created from the revenue of the entire water system from which the payments on the contract are to be made. In other words, it is not only the income *earned by the property purchased* that constitutes the special fund from which the payments are to be made, but the income from the *entire water system* constitutes such special fund. It is obvious that although the contract provides the payments to Fairbanks, Morse & Co. shall solely be made from this fund, and shall not constitute a general obligation of the city, indirectly such contract does create a general indebtedness or liability of the city. It seems too clear to require further elaboration that if the water fund be depleted by the payments made to Fairbanks, Morse & Co. for the pumping plant, the fund created for the payment of interest and principal on the bonds will be depleted, and that since such bonds are a general obligation of the city, the taxpayers must at all times be ready to feed the special fund if the income is not sufficient to pay both the interest and principal on the bonds and the payments to Fairbanks, Morse & Co. It follows, of course, that when this contract was executed the taxpayers became indirectly liable to pay the amount thereof. We do not believe that the "special fund" doctrine was ever intended to be applied to a situation where the municipality, directly or indirectly is or may be compelled to feed the special fund from other revenues in addition to those arising from the special improvement contemplated. Such a subterfuge, if sanctioned, would go far to effectually wipe out the purpose and intent of the constitutional provision.

A case very similar to the instant case, likewise involving a Fairbanks, Morse & Co. contract, has been recently decided by the circuit court of appeals, eighth circuit,—*City of Campbell, Mo.,* v. *Arkansas-Missouri Power Co.,* 55 Fed. (2d) 560. In that case the action was brought to enjoin the city and Fairbanks, Morse & Co. from carrying out the provisions of a contract for the purchase of certain machinery to be used by the city as a part of its municipal light plant. It appears that at the time the contract was entered into the city, by means of a bond issue approved by the people,

already had constructed a distributing system and a power house. The contract with Fairbanks, Morse & Co. was for the purchase of certain machinery for the power plant. The total purchase price of $62,366.40 was to be paid in seventy-two monthly installments, each installment being evidenced by an order providing that said payment was to be made solely out of the light and power fund, and such obligation was not to be a general obligation of the city, "but is a special obligation payable only out of the net revenues of the Light & Power Plant". By the terms of the contract net revenue was defined as the balance of the gross receipts of the power plant after the payment of the legitimate and necessary expenses of the operation of the plant, *plus interest on the bond issue,* were deducted. It is to be noted that the legal and factual situation presented by the above contract is almost identical with those presented in the instant case. In fact, the contract above outlined presents a situation much stronger in favor of upholding the contract than does the case at bar for the reason that the specific fund from which the payments were to be made was defined as the fund remaining in the light and power fund after interest on the bonds was deducted, a provision not found in the contract here under consideration. The court held that the contract violated the debt limitation clause in the Missouri constitution. In so holding the court stated at page 563: "There is, however, further reason for holding that this contract resulted in creating a debt. The machinery sold to the city, as has been pointed out, does not constitute the entire plant which generates and distributes the electric current and produces the revenue for such service. It required in addition to this machinery the equipment and the powerhouse owned by the city. The purchase price, under the provisions of this contract, is not to come alone from the earnings of the property sold. Under such circumstances, the obligation to pay the income of the property other than that purchased is not different from an obligation to pay with any other funds. (*Bell* v. *City of Fayette,* 325 Mo. 75 [28 S. W. (2d) 356, 360]; *Schnell* v. *City of Rock Island,* 232 Ill. 89 [14 L. R. A. (N. S.) 874, 83 N. E. 462]; *Feil* v. *City of Coeur d'Alene,* 23 Idaho, 32 [43 L. R. A. (N. S.) 1095, 129 Pac. 643]; *City of Ottumwa* v. *City Water Supply Co.,* (C. C. A.) 119 Fed.

315 [59 L. R. A. 604]; *Hesse* v. *City of Watertown*, (S. D.) [232 N. W. 53]; *State* v. *McMillan*, 12 N. D. 280 [96 N. W. 310]; *Wilder* v. *Murphy*, 56 N. D. 436 [218 N. W. 156].)

"The contract in question requires the use of the earnings of the entire property. In *Bell* v. *City of Fayette, supra,* the court said: 'It will be noted that the distinction is whether any other property of the city is liable for the payments or whether the purchase price of such improvement is to be paid for wholly out of the earnings of the improvement.'

"Notwithstanding the skillful attempt to evade the constitutional inhibition against the creation of indebtedness, we think it clear that the subterfuge resorted to does not have that effect, and that the lower court properly held that the contract was void."

The reasoning of the Supreme Court of Illinois in the case of *Schnell* v. *City of Rock Island*, 232 Ill. 89 [14 L. R. A. (N. S.) 874, 83 N. E. 462], is also applicable here. In that case the court stated: "In this case the entire proceeds of the existing waterworks system were pledged to secure payment of the certificates, and they created an indebtedness against the city. The case is not like that of *Village of East Moline* v. *Pope*, 224 Ill. 386 [79 N. E. 587], where the scheme was to erect and establish a new system of waterworks. It was there said, in accordance with the principles of *City of Joliet* v. *Alexander*, 194 Ill. 457 [62 N. E. 861], that if nothing but the income from the waterworks had been pledged, or could be reached, the bonds would not create a debt, and in that case relief was granted because of the provision for a special tax. A city may acquire a system of waterworks by pledging the income until it shall pay for the system, and no indebtedness is created. The same rule might apply to some definite extension of waterworks where the income of the extension could be separated and applied to payment, but an obligation to pay with the income of the property already owned by a city is not different from an obligation to pay with any other funds, so far as the question whether the transaction amounts to a debt is concerned."

The logic of these cases, and of the cases cited by the Federal Circuit Court, seems unescapable. The contract here involved is not payable solely from the income of the

improvement contemplated, but is payable from the revenues of the entire water system. Part of those revenues can, and in fact must, be applied to the payment of the interest and principal on the bonds which is a general obligation of the city.

The respondents attempt to distinguish the cases above cited on the ground that in the above cases it does not appear that there was a city ordinance similar to Ordinance No. 1287 of the City of Santa Cruz requiring that all the revenue of the water plant must go into the water development fund which can only be used for the mainte-nance, upkeep, construction and repair of the water plant. The argument proves too much. By the very terms of the ordinance relied upon, as above quoted, the revenue from the water plant is likewise to be used to pay the interest and principal on the bonds, which are general obligations of the city. If this fund is depleted the obligation to feed the fund will fall upon the taxpayer. Respondents state: ''The money in the special fund cannot be placed in the general fund, nor used for charges to be met from tax-raised funds.'' Such a contention is directly in the face of the terms of the ordinance relied on by respondents, because that ordinance specifically states that the money in the water fund shall be used to pay a general obligation of the city, namely, the interest and principal on the bonds.

For still another reason we are of the opinion that the contract here involved must be held violative of the con-stitutional provision. It will be remembered that the con-tract provides for an immediate cash payment of $30,000, which was paid according to the allegations of the complaint ''out of the public funds of said city of Santa Cruz''. This positive allegation may have been weakened by the amend-ment to the complaint, although we do not think that this is so, but certainly there was nothing in the contract which required the city to make this payment from the water fund. The city also agreed to pay the taxes and insurance on the property, and to pay certain expenses caused by the change in the location of the pumping plant, all apparently out of the general funds. It is true that when these payments were made, and probably when the future payments are made for each item, such payments themselves will not constitute a violation of the constitutional provision.

This is so because it is admitted that the $30,000 payment was made from funds on hand during the year 1927–1928, and such payment when added to the other expenditures of the city for 1927–1928 did not exceed the revenue for that year. The payments for taxes and insurance can probably be made out of the revenue of the year in which they are made. But by the provisions of the contract all these payments, as well as the installment payments made from the special fund, will be forfeited to Fairbanks, Morse & Co. if the payments called for by the conditional sales contract are not made when due. In other words, the effect of a default under the contract would be to take from the taxpayers money paid by them from their general funds. It seems clear that after a large cash payment has been made out of the general funds, if the special fund is not sufficient to pay the installments, and a failure will result in the losing of the cash payment as well as the installments, as a practical matter the installments will have to be paid from the general fund in order to protect the investment already made. It was in reference to such a practical argument that this court stated in the case of *In re City and County of San Francisco, supra,* at page 438: "It also quite clearly appears that the so-called option on the part of the municipality to purchase the said property becomes in effect an increasing compulsion upon it to consummate such purchase, since not to do so would result in the irrevocable loss to the municipality not only of the primary and succeeding annual payments, which it is bound to make under this agreement, but also of the entire usufruct of the property during the period of its occupation, and also of the property itself." So in the case at bar, failure to make the installment payments would result in the loss of not only the installment payments, but also in the loss of the $30,000 and other sums not made payable from the special fund. The practical compulsion to protect the investment by making the payments from the general fund if the special fund prove insufficient constitutes in our opinion a violation of the constitutional provision in fact. It is no answer to say that the $30,000 was paid and the other payments for taxes, insurance, etc., will be made from the special fund. The contract does not so provide.

 We are not unmindful of the arguments of expediency and necessity advanced by respondents, but we are of the opinion that such arguments are not sufficient to uphold this contract. The constitutional provision involved is based on sound public policy. Arguments of convenience, of policy, or of present necessity, should not be allowed by loose construction to weaken the force or limit the extent of the debt limit provisions.

Inasmuch as we are of the opinion that the contract involved violates the constitutional provision, we do not find it necessary to discuss the many other points raised and discussed by the litigants.

For the reasons heretofore stated the judgment appealed from is reversed.

Rehearing denied.