[S. F. No. 14899. In Bank.—May 26, 1933.]

DEPARTMENT OF WATER AND POWER OF THE CITY OF LOS ANGELES, Petitioner, v. JAMES P. VROMAN, as Secretary, etc., Respondent.

Erwin P. Werner, City Attorney, Loren A. Butts, Assistant City Attorney, Fred M. Bottorff, Deputy City Attorney, Joseph Scott, Brice Claggett and S. B. Robinson for Petitioner.

Guy Richards Crump and W. H. Anderson for Respondent.

SHENK, J.—This is an application for a writ of mandate to compel the respondent as secretary of the board of water and power commissioners of the city of Los Angeles to sign a proposed contract between the Department of Water and Power of said City and the Reconstruction Finance Corporation. The matter is submitted on a general demurrer to the petition.

From the petition the following facts appear:

The Department of Water and Power is an established charter department of the city of Los Angeles (Stats. 1925, p. 1094), and has charge, superintendence and control of works for providing and supplying said city and its inhabitants with electric energy for light, heat, power and other purposes. This department is the successor of the board of public service commissioners of said city (Stats. 1925, p. 1099), which in turn was the successor of the board of water commissioners created by charter amendment in 1903 (Stats. 1903, p. 555). The department is under the management and control of the board of water and power commissioners, of which the respondent is the secretary. The said works consist of hydroelectric generating plants, transmission

lines and other facilities located partly within and partly without the city.

Prior to May 16, 1922, the distributing lines of said system were of limited extent and supplied approximately 20,000 consumers, or about one-tenth of all the consumers then served with electricity within said city. On May 16, 1922, the department came into possession, by purchase, of the distributing system and business within the. city of the Southern California Edison Company, and has since operated the combined systems, serving thereby at this time approximately 269,000 consumers, or about two-thirds of all of the consumers of electricity within the city.

Pursuant to an act of Congress known as the "Boulder Canyon Project Act", approved December 21, 1928, and under certain contracts entered into by the Secretary of the Interior thereunder, the United States is engaged in the construction of a dam on the Colorado River in the states of Arizona and Nevada for the purpose of erecting a reservoir having a capacity of about 29,500,000 acre-feet of water for the storage of the waters of said river, and in connection therewith it is intended to construct certain outlet works, pressure tunnels, penstocks, and power-plant buildings, and to install certain power-plant machinery. The power plants and machinery thus to be installed have been leased to certain lessees. Pursuant thereto the petitioner herein will operate a large portion of said electrical machinery. When said dam and electrical works have been completed, 4,240,-000,000 kilowatt hours per year of firm electric energy will be available therefrom.

Pursuant to said act of Congress and said contracts the Secretary of the Interior has allocated to the states of Arizona and Nevada and to certain municipalities, a public district, and certain private corporations in California, said quantity of firm electric energy to be generated. Under said contracts the petitioner has the privilege of using the falling water from said dam to operate the portion of said electric generating works which are to be operated by it for the purpose of supplying the city and its inhabitants with electric energy, and the petitioner is obligated to pay large sums of money for the privilege of taking the energy so generated. It is intended that the generating works to be constructed by the United States will be ready to deliver electric energy

to the petitioner on or about September 1, 1935, and during the first year thereafter the petitioner will be obligated to take an approximate maximum of 767,354,000 kilowatt hours of said electric energy so generated, and this maximum possible obligation will increase from year to year until in the fifth year the maximum possible obligation will require the taking of 1,482,307,000 kilowatt hours at the generating plants.

Included in the municipalities to which electric energy has been allocated under the contracts with the Secretary of the Interior are the cities of Pasadena, Glendale and Burbank in Los Angeles County and those cities will be served by means of the transmission lines which the petitioner is required by contract to construct in order to transmit electric energy from the power plants at the dam to the city of Los Angeles, and it is necessary that the construction of said transmission lines and receiving lines and switching facilities be commenced at the earliest possible moment in order that the same may be in readiness to take said electric energy as soon as the same is available at the generating plants.

For the purpose of supplying the funds for the construction of said transmission lines and facilities in connection therewith the petitioner has heretofore made application to the Reconstruction Finance Corporation (hereinafter called the corporation), a public corporation organized and existing under the laws of the United States, and being an agency of the federal government for financial aid, among other things, in constructing certain electrical works. On February 1, 1933, the board of directors of the corporation adopted certain resolutions agreeing to advance to the petitioner the sum of $22,800,000 as a loan to be used in paying the cost of said transmission lines and facilities. Thereafter on April 22, 1933, the executive committee of the corporation, by resolution, authorized the execution of a contract providing for said loan on certain terms and conditions, and on that day said contract was executed by the treasurer of the corporation on its behalf.

On April 25, 1933, the board of water and power commissioners (hereinafter called the board), adopted certain resolutions declaring the necessity for the immediate construction of said transmission lines and facilities; that the revenues from the electrical system now operated by the

petitioner and from the works to be constructed will be sufficient to pay the expenses of the contemplated work and to pay the principal and interest on all of the outstanding general bonds of the city heretofore issued for the construction and acquisition of electrical works by the city and to pay the principal and interest on the proposed loan from the corporation; that said loan be authorized; that notes of the Department of Water and Power be executed to evidence said loan in installments as made; that a reserve fund be established to insure the application of the proceeds of said loan to the purposes for which they are to be made; that the city council be requested to approve by ordinance that portion of the contract which provides for the fixing of rates and charges for electric service to consumers sufficient to pay the principal and interest of said loan and other obligations of or on behalf of the board, payable out of the power revenue fund; that the city council be requested to express by ordinance its intention with respect to the issuance, within the period during which any portion of said loan remains unpaid, of bonds or other evidence of indebtedness payable out of the power revenue fund, and that a reserve fund be established to insure the payment when due and payable of the principal and interest on said loan.

The pertinent sections of the proposed contract or loan agreement between the corporation and the petitioner provide: In section 1, for the loan of $22,800,000 in installments commencing as soon as practicable after compliance by the department with the conditions imposed, the obligations to be evidenced by non-negotiable notes of the department. In section 2 (f) that the notes "shall provide that the department shall not be obligated to make any payment thereunder as to principal or interest except out of the power revenue fund provided for by and established pursuant to the provisions of the charter of the city of Los Angeles . . . or out of the reserve fund to be created out of the power revenue fund as provided in section 10 hereof". Section 3 provides that the money loaned shall be used only for the purposes named, and that the department will by resolution of the board establish, subject to the approval of the city council by ordinance, a reserve fund to be known as the "Power Transmission Construction Reserve Fund" to insure the application of the proceeds of the loan to the

designated purposes. In section 5 the department agrees that, subject to the approval of the city council by ordinance, it will fix rates and collect charges for electric energy distributed by it for use within or without the city, in such amounts as will provide revenues at least sufficient to pay, as the same shall become due, (a) the necessary expenses of conducting the business of the department pertaining to the power system; (b) the principal of and interest on said notes; (c) the principal and interest on all other obligations of the department or of the city payable out of the power revenue fund at any time having priority over or being on a parity with said notes; and (d) all other obligations and indebtednesses payable out of the power revenue fund. In section 7 the department agrees that at least thirty days prior to any recommendation or other action by it with respect to the issue hereafter of any bonds, notes or other obligations payable out of the power revenue fund (with an exception not necessary to be noted), it will notify the corporation of the amount of the proposed issue and the terms, conditions and purposes thereof. The department then expresses its intention, without incurring any legal obligation or liability, not to recommend or take any other action, except with the written consent of the corporation, in favor of the issue, hereafter, of any bonds, notes or other obligations issued as evidence of indebtedness payable out of the power revenue fund, unless it shall simultaneously take like action in favor of the issue of at least an equal principal amount of general bonds of the city or other evidence of indebtedness payable out of the power revenue fund for the purposes of retiring said notes, and to cause the proceeds of said general bonds to be applied to the retirement of said notes, in so far as the department may lawfully do so; and in this connection the department expresses its intention, without incurring any legal obligation or liability, not to recommend or take any other action in favor of the issuance, hereafter, of any bonds, notes or other obligations payable out of the power revenue fund, which would increase beyond $62,000,000 the principal amount of outstanding obligations (including the notes here in question), payable out of the power revenue fund, having priority over or being on a parity with said notes, if the corporation shall have notified the department within fifteen

days after the aforesaid thirty days' notice that it considers that such proposed additional issue would adversely affect the interests of the holders of said notes.

In section 10 the department agrees that it will, by resolution of the board, subject to the approval of the city council by ordinance, establish a reserve fund, to be known as the "Power Notes (Reconstruction Finance Corporation) Reserve Fund", to insure the payment when due and payable of the principal and interest on said notes; such fund to be created and maintained by apportioning and setting apart moneys out of the power revenue fund to said reserve fund periodically so that the moneys so set apart shall be available for the payment of the maturing principal of said notes at least two months before the same matures. The department further agrees that, pursuant to the provisions of section 223 of the city charter, it will apportion and set apart out of the power revenue fund each year, so long as any of the notes remain unpaid, an amount sufficient to pay at maturity all sums coming due in said year for principal and interest upon all general bonds of the city issued for the purposes of the power system and that it will comply with all requirements of law relating to the payment of principal of or interest on such bonds out of the power revenue fund.

In section 17 it is provided that the corporation shall not be under any obligation to make said loan unless ordinances of the city council shall have been duly enacted in manner and form satisfactory to it (a) approving the creation of the reserve fund provided for in section 3, (b) approving the agreement of the department with reference to the fixing of rates and charges contained in section 5, (c) approving the creation of the reserve fund provided for in section 10, and (d) expressing the council's intention to the same effect as the intention of the department expressed in section 7.

Additional facts set forth in the petition should be stated in order to understand the objections interposed by the respondent. At the close of the fiscal year on June 30, 1932, the department had under its management and control assets pertaining to electrical works, after provision for current outstanding liabilities, of the approximate value of $86,000,000. At various times from April 19, 1910, to

August 31, 1926, bonds of the city of Los Angeles were authorized for purposes of electrical works, in the aggregate amount of $50,500,000. All of these bonds were authorized by a vote of the people of the city pursuant to section 18 of article XI of the Constitution and the Bond Act of 1901 (Stats. 1901, p. 27); and said bonds have been issued and sold except $3,000,000 of the $11,000,000 authorized on August 31, 1926. By the charter of the city a certain fund was created designated as the power revenue fund. Into this fund have been deposited the proceeds of the $47,500,000 of bonds heretofore issued and sold and all revenue from other sources, including that derived from the sale or use of electric energy in connection with the electrical works of the city. From this fund all payments of principal and interest on said outstanding bonds have been made when due without resort to general taxation to meet the same to the extent of $10,966,000 on principal and $18,054,467 on account of interest. General funds of the city have heretofore contributed to said power revenue fund the sum of $5,867,495, more than one-half of which has, from time to time, been returned to the general funds of the city. The board has by resolution declared its intention to return the balance thereof to the general funds of the city from time to time until the same is fully paid at the close of the fiscal year 1934–35.

On March 20, 1933, the chief electrical engineer and general manager of the bureau of power and light in said department submitted a report to the board, which is set forth in full in the petition, from which it appears that the anticipated revenues from the electric works of the city for each fiscal year during the period provided in said loan agreement for the repayment of said loan will be more than sufficient to pay all the expenses of maintenance and operation of said works during each fiscal year, including all sums coming due during such fiscal year under said contract with said corporation, and to pay all sums coming due during such fiscal year for principal and interest upon all outstanding bonds of the city and obligations issued for the purposes of said works, including the obligations to be issued to evidence the loan of $22,800,000 from said corporation, and to leave large sums still available from said revenues for extensions and betterments. Also, that such

revenues will be sufficient for all of said purposes without increasing the rates for service to consumers of electric energy; that the rates now charged for such service are only about two-thirds of the average of the rates charged in large cities generally throughout the United States for similar service; that without undue burden on consumers and without raising the same to such average, the rates now charged could be increased so as to make available all sums required for the payment of both principal and interest on the proposed loan from the corporation out of the excess of revenues resulting from such increase, over and above the revenues which would be received without such increase.

With the foregoing factual background and financial setup in contemplation, the respondent contends that the contract, if executed, would be illegal: (1) because the contract provides for the repayment of moneys to be borrowed out of revenues from the existing electrical works of the city as well as revenues from the transmission system proposed to be constructed out of the moneys so borrowed, thereby incurring an indebtedness by the city of Los Angeles in violation of section 18 of article XI of the Constitution; (2) because said contract provides for the repayment of moneys out of the power revenue fund of said department notwithstanding the fact that there are now outstanding general obligation bonds of said city issued for the purposes of the works to which said power revenue fund pertains and with respect to which the board is required each year to apportion and set apart out of said fund an amount or amounts sufficient to pay at maturity all sums coming due thereon, and that thereby an indebtedness on behalf of the city will be incurred without an election and in violation of the same section of the Constitution; (3) because the board has no power, either with or without the approval of the city council to enter into an enforceable contract to maintain rates for service to electric consumers sufficient to provide for all existing charges against the power revenue fund and to pay at or before maturity the principal and interest on the loans now proposed; and (4) because said contract provides that the total amount to be borrowed is to be advanced by the corporation in the form of six (or under certain circumstances three) separate and distinct loans, at as many different times, each of which

is to be repaid in equal annual installments during the period of ten years from the date of advancement of said loan, except that no installments are provided for during the first three years following the advancement of each installment, whereas, the city charter, in section 224½ thereof, provides that an equal proportionate part of the entire amount borrowed must be repaid in each year during not to exceed twenty years, subject to the provision that no payment of principal need be required during the first three years following the date of said loan.

In the consideration of the questions presented it is of prime importance to determine who are, in law, the contracting parties, and the nature of the indebtedness or obligations to be incurred. ▮ Under the city charter the board of water and power commissioners is granted extensive powers. These powers are set forth in article XXII of the charter, adopted in 1925 (Stats. 1925, p. 1094), and subsequent amendments. Under these provisions the board is granted power, upon determining that an emergency exists, to borrow money payable only out of the revenue fund pertaining to the municipal works for or on account of which the indebtedness was created. It has long been settled that the indebtedness so created is not an indebtedness of the city as contemplated by section 18 of article XI of the Constitution. (*Mesmer* v. *Board of Public Service Commrs.*, 23 Cal. App. 578 [138 Pac. 935]; *Shelton* v. *City of Los Angeles*, 206 Cal. 544 [275 Pac. 421].) The emergency has been declared to exist in the present case and all of the preliminary proceedings required by the charter and otherwise by law have been complied with. The Shelton case involved the power of the board to issue notes payable out of the water revenue fund, also under the control of the board. The power revenue fund is in the same legal situation. When the Shelton case was decided the charter (sec. 224) provided that the indebtedness so created should be payable in not to exceed five years. Obviously anticipating the necessity of financing the construction of the transmission line from the Colorado River to the city, and having in view the probable uncertainty and difficulty in obtaining money elsewhere, the people of the city ratified a proposed amendment to the charter and the same was approved by the legislature in January, 1933.

This section is numbered 224½ and reads in part as follows: "The board is hereby authorized to borrow money from the federal government or the state government, or any duly authorized agency created by either of said governments and acting therefor, to defray the expenses of construction work in the department."

The board is thus specially granted the power to borrow money from the federal government. The Reconstruction Finance Corporation is an authorized agency of the federal government (47 Stats. 5), as described in the charter amendment, and the Emergency Relief and Construction Act of 1932 (47 Stats. 714), contains the authority for the loan for the purposes now contemplated.

 Under the charter provisions and the decisions of the courts of this state, the board has ample power to borrow money and contract for the repayment thereof from the power revenue fund independent of the limitations of section 18 of article XI of the Constitution. The loan agreement sought to be signed, and the notes to be issued as evidence of said loan, are in no sense obligations of the city. The charter in legal effect so provides, the loan agreement in terms so provides, and the notes to be issued will so provide. Furthermore, the charter by necessary implication prohibits the levying of any taxes for the repayment of said loan. The source of repayment is the revenue collected for furnishing electric energy, and in the manner provided by the charter. The fact that the city council has approved, by ordinance, the establishment by the board of the "Power Transmission Construction Reserve Fund", and the "Power Notes (Reconstruction Finance Corporation) Reserve Fund", in no sense makes the city itself a party to said loan agreement. The creation of such funds, with the approval of the city council, is authorized by the charter as a matter of internal fiscal arrangement. Nor are we able to conclude that the city council's approval by ordinance of other provisions of the loan agreement with reference to limitations on future action concerning the issuance of obligations, etc., payable out of the power revenue fund, creates any binding obligation on the part of the city itself. The ordinance specially states that no legal obligation or liability is incurred thereby, and the ordinance in this respect is at most an expression of intention.

The ordinance which agrees on the part of the city council hereafter to approve rates fixed by the department for electric energy sold by it sufficient to provide revenues to meet the requirements of said loan, so long as any portion of the indebtedness of the board thereunder remains unpaid, may in terms constitute the city, to that extent, a party to said loan agreement, but no indebtedness or liability is thereby incurred in the sense that the general revenues of the city are thereby pledged, or payment therefrom anticipated.　　It is insisted that this ordinance is an unlawful suspension or surrender of legislative power within the doctrine of *Thompson* v. *Board of Trustees*, 144 Cal. 281 [77 Pac. 951]. Under appropriate circumstances the doctrine there announced would apply, but as to the facts now presented we find in section 223 of the charter, as amended in 1927 (Stats. 1927, p. 2026), a binding obligation on the part of the board to apportion each year out of the revenues from electric energy, sufficient to pay at maturity all sums coming due on obligations of the board, as well as sums coming due on all outstanding general bonds of the city issued for the purposes of the electric works, with certain exceptions not necessary to be noted. There is therefore a legal obligation on the part of the board, in fixing rates, to do what the city council has now agreed that it will approve, and there is at least an implied duty on the part of the city council under the charter to do what it has by ordinance agreed to do, i. e., to approve adequate rates for electric service. Clearly no unlawful suspension or surrender of legislative power has taken place. The charter contemplates that the department shall be self-sustaining and the requirement of approval by the city council by ordinance of the rates fixed by the board was obviously imposed, among other things, to insure the fixing of rates reasonable and adequate for all required purposes.

We attach no particular significance to the first objection, as such, viz., that the loan agreement provides for the repayment of moneys to be borrowed by the department out of revenues from the existing electric system as well as from revenues for the transmission system proposed to be constructed, and that thereby the constitutional provision is violated. If it has any importance it is in connection with the second objection which is to the effect

that, although the moneys to be borrowed are payable only out of the power revenue fund, said fund may prove to be inadequate, and the general taxpayers may in that event be required to pay taxes to meet the sums to become due on the general bonds of the city heretofore issued for the construction and acquisition of a municipal electric system, thus rendering the loan agreement and the notes to be issued pursuant thereto without the scope of the special fund doctrine to which this state is committed. (See *Shelton* v. *City of Los Angeles, supra; In re California Toll Bridge Authority,* 212 Cal. 298 [298 Pac. 485] ; *California Toll Bridge Authority* v. *Kelly, ante,* p. 7 [21 Pac. (2d) 425].) It would seem that the Shelton case alone had placed the revenue funds under the control of the board definitely in the category of special funds, the obligations against which are not responsive to section 18 of article XI of the Constitution; but it is insisted that this court in *Garrett* v. *Swanton,* 216 Cal. 220 [13 Pac. (2d) 725], has so limited the special fund doctrine as to exclude the present case from its application. To this we cannot agree, and the cases are readily distinguishable. In *Garrett* v. *Swanton, supra,* the contracting party was the city, a governmental entity held directly submissive to the constitutional mandate. Here the contracting party, in so far as concerns the incurring of the indebtedness or liability is not the city of Los Angeles, as a municipal corporation, but is an independent municipal agency not controlled by the constitutional provision. ▆ It is true that if the contingency should arise that the funds of the department should be so depleted as to be insufficient to satisfy all of the obligations enjoined by contract and by the charter upon it, then the taxpayers might be called upon to provide the revenue with which to pay the principal and interest on certain outstanding general bonds. But the electors in authorizing those bonds bound the taxpayers constitutionally to meet those payments and nothing has occurred since the issuance thereof which would relieve them of that burden, unless it may be said that by the charter amendment subsequently adopted the obligation to pay them has been transferred by the fundamental law of the city from the taxpayers to the board.

Each case must necessarily rest upon its own facts. On the showing here made, the department is and will be able not only to repay the proposed loan from the federal government, but will also be able to meet, as provided by the charter, the obligations heretofore assumed by the city by general bond issue for electric system purposes. Under such circumstances the taxpayers would be in no position to complain by reason of the proposed loan and under the law the special fund doctrine may be applied in its most comprehensive sense. We therefore conclude that the city, as such, has not by its own act incurred, nor is the board proposing to incur, an indebtedness or liability in violation of the constitutional provision.

Counsel for the petitioner have exhaustively reviewed the authorities from other jurisdictions bearing upon the special fund theory, in an endeavor to show that the holding in *Garrett* v. *Swanton, supra,* is contrary to the weight of authority. In view of our conclusion that that case could in no event be controlling under the facts and the law here presented, it is unnecessary to review or comment on the cases cited.

What has been said disposes of the third objection of the respondent in favor of the petitioner. The fourth objection, obviously without merit, is not pressed for determination.

Let the peremptory writ issue as prayed.

Curtis, J., Langdon, J., Thompson, J., Tyler, J., *pro tem.,* Seawell, J., and Preston, J., concurred.