## Turnpike Revenue Bonds

Margiotti, Attorney General, September 28, 1937:— We have your request to be advised whether turnpike revenue bonds of the Commonwealth to be issued by resolution of the Pennsylvania Turnpike Commission in conformity with the provisions of the Act of May 21, 1937 (no. 211), will be debts of the Commonwealth within the meaning and prohibition of article IX, sec. 4, of the Constitution of Pennsylvania.

The Act of May 21, 1937, supra, creates the Pennsylvania Turnpike Commission and authorizes it to construct and finance a turnpike from a point in Cumberland County to a point in Westmoreland County. The act requires the construction to be financed wholly from funds derived from bonds of the Commonwealth to be issued by the commission. The authority of the commission to issue the bonds and the specific nature and contents of the bonds themselves are strictly circumscribed and defined in the act.

Section 1 of the act authorizes the commission "to issue turnpike revenue bonds of the Commonwealth, payable solely from tolls, to pay the cost of such construction."

Section 2 of the act, prescribing the nature and the essential contents of the bonds, provides:

"That turnpike revenue bonds issued under the provisions of this act shall not be deemed to be a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth, but such bonds shall be payable exclusively from the fund herein provided therefor from tolls. All such bonds shall contain a statement on their face that the Commonwealth is not obligated to pay the same or the interest thereon except from tolls and that the faith and credit of the Commonwealth is not pledged to the payment of the principal or interest of such bonds. The issuance of turnpike revenue bonds under the provisions of this act shall not, directly or indirectly or contingently, obligate the Commonwealth to levy or to pledge any form of taxation whatever therefor, or to make any appropriation for their payment."

Furthermore, section 8 provides, inter alia:

"The principal and interest of such bonds shall be payable solely from the special fund herein provided for such payment."

The fund referred to in section 8 is provided for in section 12, which authorizes the commission to fix and collect tolls and rentals for the use of the turnpike. That section provides, inter alia, that "Such tolls shall be so fixed and

adjusted as to provide a fund at least sufficient with other revenues of the turnpike, if any, to pay" the cost of maintenance, repair, and operation of the turnpike and all debt service, including sinking fund upon the bonds.

The commission itself is declared to be an instrumentality of the Commonwealth and is given power, inter alia, to acquire property in its own name and to pay all costs of constructing the turnpike, including reimbursement of the Department of Highways for the cost of certain preliminary work. All of these expenses, however, must be paid solely from funds provided under the authority of the act.

The commission is also given the powers of eminent domain, but property seized must be paid for out of the funds provided by the act, and the failure of the commission to accept and pay for property condemned "shall impose no liability upon the Commonwealth except such as may be paid from the funds provided under the authority of this act": Section 6.

Even though, as we have seen, no moneys of the Commonwealth except those provided under the authority of the act, i. e., proceeds of bonds, tolls, and rentals, can be expended on the turnpike, it is further provided in section 10 that the trust indenture securing the bonds "shall not convey or mortgage the turnpike or any part thereof."

The bonds, therefore, are payable solely out of the revenue derived from the turnpike. None of the general revenues of the Commonwealth are available for their payment, and no property of the Commonwealth whatsoever is pledged or made available to secure them.

We will now consider whether these bonds will be debts created by or on behalf of the Commonwealth within the meaning of article IX, sec. 4, of the Constitution. The material portion of this section is:

"No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or to pay existing debt; and the debt created to supply

deficiencies in revenue shall never exceed, in the aggregate at any one time, one million dollars."

In view of the construction placed upon article IX, sec. 8, which inhibits the creation of municipal indebtedness, by the Supreme Court of Pennsylvania in Tranter v. Allegheny County Authority et al., 316 Pa. 65, and upon section 4, quoted above, in Kelley v. Earle et al., 325 Pa. 337, we do not hesitate to conclude that the turnpike revenue bonds will not be debts created by or on behalf of the Commonwealth within the meaning of the Constitution.

In the Tranter case the authority proposed to construct bridges and tunnels and to issue its bonds payable solely from tolls collected for the use of such bridges and tunnels. The court said, at page 85:

"We are here dealing with the construction of a purely public self-liquidating project. The denial of power to incur liability on the credit of the county or of any municipality is notice to the prospective purchasers of the bonds that their security and their only source of payment will be in the revenues derived from users of the improved highway facilities: see Moore v. City of Nampa, 276 U. S. 536. The bondholders cannot call upon the public treasuries to contribute; no county or municipal property can be taken for the debt, because the bondholders have agreed to look to a special fund for payment to be raised in the manner provided. It will be the duty of the defendant corporation to provide adequate tolls and charges. These highways cannot be sold on execution.

"The two cases relied on by plaintiff point the way against him. In Lesser v. Warren Borough . . . the borough's bonds were to be secured, not alone by the revenue from the water works proposed to be purchased, but by the water works itself; if it was mortgaged for the payment of the bonds, the obligation was a municipal debt and that borough asset was liable to be taken in payment. We adhere to what was decided in that case. . . . But plaintiff in this case can point to no property that the

county or municipalities would lose. It is true that, by the trust indenture, the trustee may enter and collect tolls, if the Authority defaults, but when the debt is paid in that way, the power of the trustee and the Authority is ended, and the property reverts to the public authorities that formerly held it for the State. This difference between a pledge of property and a pledge of income merely, has been said to distinguish a transaction which creates a debt within the constitutional limitation from one creating a debt not within it."

In the Kelley case, on rehearing, a stipulation was filed setting forth that the bonds to be issued conferred no right on the holders of the bonds or the trustee to proceed or claim against the lands of the Commonwealth or of the authority. The court said:

"This was true also in *Tranter* v. *Allegheny County Authority*, supra, where the court, through Mr. Justice Linn, concludes: 'This difference between a pledge of property and a pledge of income has been said to distinguish a transaction which creates a debt within the constitutional limitation from one creating a debt not within it.' . . .

"Much stress has been laid on the various cases that have heretofore been decided. But these cases are and were distinguished in *Tranter* v. *Allegheny County Authority*, supra, and need not be further discussed in this opinion. There is one outstanding factor which the additional facts present to us—the immunity of State property and the inability of creditors to compel payments beyond the sums available for current revenues—which differentiates this contract from the contracts involved in *McKinnon* v. *Mertz*, 225 Pa. 85; *Lesser* v. *Warren Boro.*, 237 Pa. 501; *Brown* v. *City of Corry*, supra. The credit of the Commonwealth as such is not behind these bonds."

In all of the cases distinguished in the Kelley case property of the municipality was pledged. For example, in Lesser v. Warren Borough, 237 Pa. 501, the court said, at page 508:

"A municipal debt will be incurred for the payment of which certain municipal property will be pledged, and, if the debt should not be paid, that property will be sold to pay it. Certain assets of the borough may be taken from it to pay its indebtedness."

These cases, therefore, have no application to the present situation for the same reason that they were held inapplicable in the Kelley case. Here, as in the Kelley case, no part of the property can be conveyed or mortgaged to secure the bonds.

While in the Tranter and Kelley cases the bonds in question were issued by authorities which by definition were independent bodies, corporate and politic, the mere fact that bonds are issued by the Commonwealth itself does not necessarily mean that they create debts within the constitutional inhibition: Kelley v. Baldwin, Auditor General, et al., 319 Pa. 53. The fundamental basis of the court's findings in the authority cases, that the bonds were not debts within the meaning of the Constitution, was that they were payable solely out of revenues, and no property or credit of the county, in one case, or the State, in the other, was pledged as security for the bonds. In this respect the proposed turnpike revenue bonds are identical in character to the bonds under consideration in the authority cases and, as we have seen, are specifically declared by the statute not to be debts of the Commonwealth, or a pledge of its faith and credit, or secured by a pledge of its property.

Furthermore, the courts of other jurisdictions have been almost unanimous in holding that revenue bonds of a State or political subdivision payable solely out of revenues derived from utilities of a public nature do not create debts within constitutional inhibitions similar to that of the Constitution of Pennsylvania. Reference is made to Oppenheim v. City of Florence et al., 229 Ala. 50, 155 So. 859; Garrett et al. v. Swanton et al., 216 Cal. 220, 13 P.(2d) 725; State et al. v. City of Miami (1933), 113 Fla. 280, 152 So. 6; Williams et al. v. McIntosh County,

(1934) 179 Ga. 735, 177 S. E. 248; Schnell et al. v. The City of Rock Island et al., (1908) 232 Ill. 89, 83 N. E. 462; Fox v. City of Bicknell et al., (1923) 193 Ind. 537, 141 N. E. 222; Bloxton v. State Highway Comm. et al., (1928) 225 Ky. 324, 8 S. W. (2d) 392; Young v. City of Ann Arbor, (1934) 267 Mich. 241, 255 N. W. 579; Brock-enbrough v. Commrs., (1903) 134 N. C. 1, 46 S. E. 28; Kasch v. Miller, etc., (1922) 104 Ohio St. 281, 135 N. E. 813, and Park v. Greenwood County et al., (1934) 174 S. C. 35, 176 S. E. 870.

We are accordingly of the opinion, and hence advise you, that turnpike revenue bonds of the Commonwealth to be issued by resolution of the Pennsylvania Turnpike Commission in conformity with the provisions of the Act of May 21, 1937 (no. 211), will not be debts of the Commonwealth within the meaning and prohibition of article IX, sec. 4, of the Constitution of Pennsylvania.