[Civ. No. 8466. Third Dist. June 22, 1953.]

BOARD OF STATE HARBOR COMMISSIONERS FOR SAN FRANCISCO HARBOR, Petitioner, v. JAMES S. DEAN, as State Director of Finance, Respondent.

Edmund G. Brown, Attorney General, and Miriam E. Wolff, Deputy Attorney General, for Petitioner.

Frank K. Richardson for Respondent.

VAN DYKE, P. J.—Petitioner, which is a public agency of the state, proposes under enabling legislation (San Francisco Harbor Revenue Bond Act of 1951—Stats. 1951, ch. 1712) to issue bonds in the principal amount of six million dollars with which to construct certain facilities and improvements to existing facilities, for San Francisco Harbor. Respondent, as Director of Finance of the State of California, has refused to perform a duty cast upon him by the controlling legislation in connection with the issuance of these bonds.

Herein petitioner seeks the writ of this court directed to respondent to compel the performance of that duty. Respondent expressly bases his refusal to act upon the ground that the legislation under which these bonds are proposed to be issued is unconstitutional as violating the provisions of article XVI, section 1, of the state Constitution, which provides that the Legislature shall not in any manner create any debt or liability in a sum exceeding Three Hundred Thousand Dollars without the approval of the people by majority vote cast at a general election. The issues are presented to this court by petition and demurrer thereto.

The petitioner, hereinafter called the board, has for long been in charge of San Francisco Harbor. In the main, the progressive improvement of the harbor, by the construction of appropriate facilities, has been financed out of charges made to those using the harbor facilities. From time to time, however, the Legislature has authorized the issuance and sale of general obligation bonds of the state, in each instance submitting such legislation to popular vote. It is stated in petitioner's brief that the harbor has never received any money from the state save as it received the proceeds of various bond issues, and that it has paid its own way entirely out of its own revenues, including the payment of moneys necessary for servicing the bonds. With these funds and with its own revenues it has constructed and maintained the facilities which now exist and has met its own operative expenses. It is further stated that the value of the harbor property now administered by the board is approximately one hundred and twenty million dollars; that the harbor has always paid its obligations on all bonds issued; that it has complied with all sinking fund requirements of these issues and that it now has a cash balance of nearly three and one-half million dollars.

The "San Francisco Harbor Revenue Bond Act of 1951" marks a change made by the Legislature in the method of financing the facilities of the harbor. Generally under the act it is proposed that the board shall issue its own bonds upon compliance with the statutory requirements and shall pay them wholly from revenue collected. The act sets up a "San Francisco Harbor Bond Finance Board" composed of the Governor, the Director of Finance, the State Controller, the State Treasurer and the President of the Board of Harbor Commissioners. It is provided that whenever the board determines by resolution that a bond issue is necessary or desirable in order to carry into execution any of the plans or

projects authorized by the act, and so certifies to the San Francisco Harbor Finance Board, then the finance board shall, if it approves the resolution, direct the board to cause bonds to be prepared by the State Treasurer in accordance with the resolution. Thereafter, and when further statutory requirements have been met, the State Treasurer, before selling the bonds, is required to advertise for bids therefor, and Government Code, section 11080, requires that such advertisement shall be delivered to the Department of Finance, which shall publish it. This advertisement respondent has refused to approve or publish upon the ground hereinbefore stated.

The act provides that the bonds to be issued thereunder by the board shall be revenue bonds; that the bonds shall not be or become a lien, charge or liability against the state or against the board or against the finance board or against their funds or property, except that for the payment of the bonds the board may pledge all or part of the revenue to be derived from harbor facilities; that every bond must contain on its face the recital that the same is not such lien, charge or liability except to the extent of the pledge of revenues. As to the outstanding obligations in the form of general obligation bonds of the state the act provides by section 3308 that the bond indenture must provide the means by which payment of principal and interest of bonds shall be secured and shall specifically provide that the revenue by which the payment of principal and interest of bonds issued under the act is secured, shall not include such revenue as may have been or may be required for servicing any and all outstanding general obligation bonds. Maintenance and operational expenses also are prior demands upon the revenues. With these limitations, however, it is proposed to pledge the total revenue from all harbor facilities. It is alleged and not denied that all of the statutory requirements have been complied with up to the point where petitioner met with respondent's refusal.

Summing up the situation presented here, bonds are proposed to be issued under the challenged legislation which will be payable as to both principal and interest solely from revenues collected by petitioner for the use of harbor facilities and then only when payments on the outstanding general obligation bonds, and cost of maintenance and operation, have been first met out of such revenues. It is the clearly expressed plan of the Legislature that the board shall continue to be a self-supporting agency and that the tax revenues of the state shall not be called upon to meet its obligations. We

have here a proposed application of the "special fund" doctrine laid down by courts in connection with the creation of debt by states, municipalities and other public bodies whose debt creating powers are limited by constitutional or statutory provisions.

It is the general rule that an indebtedness, within the meaning of a constitutional limitation imposed upon a legislative body, does not arise unless there is a legal, equitable or moral obligation to pay a sum of money to another who occupies the position of creditor and who has a legal or moral right to call upon or constrain the debtor to pay; and that such a debt limitation is not concerned with an obligation which is payable out of a special fund if there is no accompanying liability or constraint to pay from the general fund should the special fund prove insufficient. (See annotation to *Miller* v. *Buhl,* [48 Idaho 668 (284 P. 843)] 72 A.L.R. 687.) Our courts have subscribed to this rule. (*Mesmer* v. *Board of Public Service Comm'rs,* 23 Cal.App. 578 [138 P. 935]; *Shelton* v. *City of Los Angeles,* 206 Cal. 544 [275 P. 421]; *In re California Toll Bridge Authority,* 212 Cal. 298 [298 P. 485]; *Garrett* v. *Swanton,* 216 Cal. 220 [13 P.2d 725]; *California Toll Bridge Authority* v. *Kelly,* 218 Cal. 7 [21 P.2d 425]; *Department of Water & Power* v. *Vroman,* 218 Cal. 206 [22 P.2d 698]; *City of Glendale* v. *Chapman,* 108 Cal.App.2d 74 [238 P.2d 162].)

In *Garrett* v. *Swanton, supra,* at page 227, our Supreme Court stated:

"It is the contention of respondents that since by the terms of this contract the indebtedness or liability is made payable solely out of a specified fund created entirely from the income of the water system, and is not a general obligation of the city, the constitutional provision has not been violated. This so-called 'special fund' doctrine finds ample support in the decisions of other jurisdictions where constitutional debt limit provisions similar to the one here involved, exist. It seems to be the majority rule in other jurisdictions that a limitation upon municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the municipality is not liable to pay the same out of its general funds should the special fund prove to be insufficient, and the transaction by which the indebtedness is incurred cannot in any event deplete the resources of the municipality. [Citing cases.] . . .

"The recent decisions of this court would seem to leave no room for doubt that the 'special fund' doctrine has been adopted in this state."

The doctrine has been applied to indebtedness created by state agencies. (*In re California Toll Bridge Authority, supra*; *California Toll Bridge Authority* v. *Kelly, supra.*)

It is the position of respondent that the "special fund" doctrine has not been in this state, and should not be, extended to cover the situation in the instant case; that while the special fund doctrine is accepted in California, nevertheless that doctrine is so limited that it cannot relieve the bonds proposed to be issued from the constitutional requirements. Respondent relies in the main upon *Garrett* v. *Swanton, supra,* and argues that these bonds are banned by the limitations therein stated. In that case the court declared that there were at least two well-settled limitations or exceptions to the special fund doctrine. Said the court, at page 229: ". . . [I]t is well established that an indebtedness or liability is incurred when by the terms of the transaction, a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred." The court held that the contract involved in that case came within both exceptions or limitations. We think, however, that the legislation here involved is not within either exception, as a consideration of the facts will prove. The City of Santa Cruz owned its waterworks system. It had been acquired with money raised from the sale of its own bonds, some of which were still outstanding. By the contract under attack the city had agreed that all moneys collected from the operation of the entire waterworks system would be placed in a fund to be used solely for the "operation, maintenance, construction, improvement, extension, enlargement and upkeep" of the system and for the payment of any existing bonded indebtedness. Said the court: "In other words, it is not only the income *earned by the property purchased* that constitutes the special fund from which the payments are to be made, but the income from the *entire water system* constitutes such special fund." The court concluded that the situation created was one whereby if the water fund should be depleted by payments on the contract for the purchase of the new pumping plant the fund created for the pay-

ment of interest and principal on the bonds would be depleted and since such bonds were a general obligation of the city the taxpayers would have to be ready at all times to feed the special fund whenever the income from the system was not sufficient to pay the interest and principal on the bonds and the payments on the contract. The court held that it therefore followed that by the contract the taxpayer became indirectly liable to pay the amount thereof and that the special fund doctrine would not apply. With reference to the second limitation, the court noted that the contract required an initial payment from the general funds of the city in the amount of $30,000, which had been paid and that by the provisions of the contract if these payments were not made from the special fund the property being purchased, that is, the pumping plant, would be forfeited to the seller, thus taking from the taxpayers money paid by them from their general funds. Said the court: ''It seems clear that after a large cash payment has been made out of the general funds, if the special fund is not sufficient to pay the installments, and a failure will result in the losing of the cash payment as well as the installments, as a practical matter the installments will have to be paid from the general fund in order to protect the investment already made.''

It is clear that the situation presented in *Garrett* v. *Swanton* has no parallel here. By the proposed contract between the board and those who may buy the bonds, it is not agreed that all the income earned from the existing and proposed harbor facilities will constitute the special fund from which payments on the bonds are to be made. On the contrary, the contract is specific in providing that only the surplus of such income shall constitute such special fund after all prior claims upon income, including maintenance and operation of the harbor facilities have been met. As to the second limitation stated in the cited case the contract proposed here specifically provides that no lien or charge on the existing property is bargained for. There can therefore be no forfeiture of state interests nor any constraint whereby the state may be impelled to protect its interests by use of its general funds.

The reasoning in *Garrett* v. *Swanton* holding that where property, already owned and operated as a utility and providing revenue, was to be extended or improved by borrowed funds, a contract pledging the revenue of the whole system— that already owned and that to be acquired—would not be

within the special fund doctrine, is fundamentally based upon the proposition that such a pledge of revenue might so operate to deplete the special fund as to make it necessary that general taxes be levied to make up the lack. It is the possible future effect of such a pledge of revenue that bans the contract. *Garrett* v. *Swanton* does not hold that such a pledge, in itself, inevitably creates a prohibited debt. If the contract be in such form that the general revenues cannot be drawn upon, even though the special fund proves insufficient for all of the demands that may be made upon it, if no forfeiture of state interest can occur, then the case will not be one outside the scope of the doctrine. Each case must rest upon its own facts.

 Here, under the statutory and contractual provisions we have stated there is no possibility that a prohibited result can follow if the revenues do not prove sufficient. If that happens the bondholders will be limited to subjecting to their demands such portions of the income as will in fact remain, after the requirements of the general obligation bonds, and the cost of maintenance and operation, have been met. Under the clear terms of the statute and the proposed contract that is the only result that can follow any diminution of the revenues to a point where from time to time they may not be sufficient to meet all demands. The statute provides that it shall be the duty of the board to so fix its rates and charges for the use of the harbor facilities as to yield an income sufficient to meet all such demands. When this fact is considered, along with the other matters hereinbefore discussed, including the long and successful history of the board as a self-sustaining agency, it is seen that in all probability the revenues will over the years prove adequate to meet all demands. This expectation is soundly supported by the board's estimate of revenue, expense and the net amount available for debt service. But however the future shall develop in this respect, the actual pledge of revenue proposed to be made is, as we have said, limited to the surplus remaining after servicing prior debts and providing for maintenance and operation, and under those contractual provisions bondholders cannot under any contingency make demand, legal, moral or by way of constraint, upon the general credit of the state.

Let the writ issue as prayed for.

Schottky, J., and Bedeau, J. pro tem., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 20, 1953.