STATE OF MINNESOTA, DEPARTMENT OF RURAL CREDIT, v. COUNTY OF WASHINGTON AND OTHERS.[1]

May 17, 1940.

No. 32,505.

[1]Reported in 292 N. W. 204.

*Goodrich M. Sullivan,* Assistant County Attorney, for appellants.

*Theodore N. Ofstedahl* and *Dudley C. Ericson,* for respondent.

JULIUS J. OLSON, JUSTICE.

This suit was brought under the provisions of our declaratory judgments act to determine (1) whether the state when acquiring title to mortgaged lands through the operation of its rural credit department may have all general tax liens which accrued against said lands while in private ownership cancelled or abated upon acquisition of title by foreclosure; (2) whether all taxes so accruing during the operative term of a contract for deed issued by the state to a *bona fide* purchaser and which remain unpaid at the time of cancellation thereof may be similarly cancelled or abated; and (3) whether ditch liens validly levied and spread against mortgaged lands prior to the time of acquisition of title by the state are enforceable as such against the land after the state has acquired title by foreclosure or voluntary conveyance to bring about the same result.

Defendants are the county of Washington, its board of commissioners, and auditor. We shall refer to them as "defendant," the county being the real defendant, the individuals being sued only in their representative capacity.

The rural credits bureau is an agency of the state established under an act of the legislature by express authority granted by the constitution. The setup of the bureau and its functions are adequately stated in In re Delinquent Real Estate Taxes, Polk County, 182 Minn. 437, 234 N. W. 691, and are further elaborated in State ex rel. Common School Dist. No. 15 v. Sageng, 182 Minn.

565, 235 N. W. 380, so we need not repeat what has there been said.

As we have seen, the first question presented relates solely to general taxes levied and assessed during the time the mortgaged premises were individually owned, the title later being divested by means of foreclosure or voluntary conveyance on the part of the owner. In the Polk county tax case (182 Minn. 437, 234 N. W. 691), it was definitely determined that subsequently accruing taxes could not be imposed upon property so acquired because the property became public, was no longer privately held or owned, and was consequently immune to taxation. But that case does not determine the present cause. This is conceded. The state's position now is that these tax liens merged "in the greater fee title of the state and are extinguished the moment the state becomes the owner of the land affected thereby."

Under our system of real estate taxation the taxed land is the sole source to which the state and its subdivisions may look for the revenue. There is no personal obligation on the part of the owner. 6 Dunnell, Minn. Dig. (2 ed. & Supps.) § 9281, and cases under notes 29 and 30. This being so, if any private bidder had purchased tax certificates for the delinquent taxes here involved, can it be said that there has been a merger? True, the present situation does not present that particular phase, but it is easily conceivable, in fact quite probable, that there are cases where just that situation exists.

The state's title rests upon foreclosure of its mortgage, a mere lien until foreclosed and the period of redemption has expired. So unless there are compelling reasons otherwise we should hesitate to say that its position is wholly different and distinct from that of any other mortgage holder in respect of the tax situation here presented. The statute (L. 1923, c. 225, 1 Mason Minn. St. 1927, § 6030, et seq. as amended, and particularly § 6038) authorizes and directs the bureau in respect of the "terms and conditions" upon which it "shall make loans." Thus we find that the "loan shall be secured by a duly recorded first mortgage on improved or partially improved farm land" within this state "owned, occu-

pied and used in good faith by the mortgagor" (1 Mason Minn. St. 1927, § 6038a); that the "mortgage shall contain an agreement providing for the repayment of the loan on an amortization plan," etc. (*Id.* b); that the bureau "may lend money on farm lands subject to liens or assessments for drainage, payable in installments, not due at the time of making such loan" (*Id.* c); that "every borrower * * * by express covenant in his mortgage deed shall pay when due all taxes, liens, judgments, assessments and insurance, * * * and by such covenant shall agree to and shall keep insured against fire and the elements * * * all buildings, the value of which was a factor in determining the amount of the loan"; that, in addition, all "taxes, judgments, assessments and other liens, affecting the security of the mortgage, and not paid when due, may be paid by the mortgagee, * * * and, when any buildings shall not be insured or kept insured as aforesaid, the Bureau, at its option, may obtain such insurance and pay the cost thereof, and any payments by the Bureau for any of the purposes aforesaid shall thereupon become a part of the debt secured by the mortgage, and shall bear" interest at seven per cent per annum. (*Id.* i.)

We need go no further in elaboration. It is obvious that the bureau was clothed with ample power to function as efficiently and effectively as any private concern engaged in like activities.

If title had been obtained by any other mortgagee under circumstances identical with those here appearing it is clear that the bidder at the foreclosure sale would have been required so to make his bid as to take into consideration prior liens and claims. As such, he would be presumed to have intended to pay the amount of his bid plus taxes and prior encumbrances. Holt State Bank, by Veigel, v. Hamernes, 171 Minn. 350, 351, 214 N. W. 52; 41 C. J. [§ 1455], p. 1000, notes 85 and 88; or, as stated in Peterson v. Herington, 169 Minn. 65, 67, 68, 210 N. W. 617, 618:

"At the sale plaintiff [the bidder] must have regulated her bid with a view to the prior liens and only gave what the land

was worth over and above such liens. * * * The amount of her bid, in law, meant that she would take the land subject to such liens," *i. e.*, a prior "mortgage, interest and taxes."

With these observations, we may now go directly to decision of the questions presented:

1. As has been seen, when the state acquired title to the mortgaged lands there were general tax charges against them accruing during private ownership. We think the state occupies in respect to such taxes no other or better position than that of any other purchaser. Were we to assume otherwise it would mean that a private bidder at the sale would be held to place his bid upon a different basis than that of the state, namely, that he would take the land subject to the taxes and prior liens whereas the state could safely bid without being so limited. Foreclosure sales are public and competitive. Each and every bidder should have the right to know that there is equality of opportunity and nothing of hidden advantage to anyone. The broad authority given to the bureau clearly indicates that the legislature had in mind that the mortgaged property was to be subject to tax accruals during the period of private ownership; that such taxes and other "disbursements under this subdivision prior to the date when the state acquires title to the real estate covered by mortgage under foreclosure proceedings shall be paid from the Rural Credit Fund, and all disbursements in connection with said real estate after such date shall be paid from the Rural Credit Expense Fund." (1 Mason Minn. St. 1927, § 6038i.)

2. For the same reasons we think the same result must be reached under circumstances where, as here, a sale was made by the state to a *bona fide* purchaser under contract for deed. Taxes levied during such ownership are and remain liens against the property while in such ownership. If such taxes remain unpaid when the contract is cancelled we see no escape from the same result being reached. The purchaser is the equitable owner, the vendor holding the legal title as security for the unpaid purchase money. Summers v. Midland Co. 167 Minn. 453, 455, 209 N. W.

323, 46 A. L. R. 816. Assuming that the contract for sale is in accordance with directions given the bureau under the act, it is safe to assume that the purchaser was required thereby to pay taxes levied and assessed against the purchased property during the time the contract remained in force. The tax not being personally enforceable against him under the tax law, it necessarily follows that his obligation to pay taxes was purely contractual and as between him and the bureau depended for its enforcement upon contract relationship. In this respect the situation is entirely different from that discussed in State ex rel. Miller v. Bruce, 50 Minn. 491, 52 N. W. 970, cited and much relied upon by the state. There "school lands" were involved which had been sold under contract against which taxes later were levied, and, remaining unpaid, tax sales were made. One Miller purchased the tax certificates, "thereby acquiring (1878 G. S. ch. 38, § 21) in case no redemption was made, the rights and interests of the parties who had previously" acquired the lands under "state certificates" in the manner prescribed by law. (50 Minn. 494, 52 N. W. 970.) The owners failed to redeem from the tax sales. Miller made no effort to be substituted in their place, as he could have done under the law. The land was sold some two years later by the land commissioner to another, a stranger "to these transactions." The tax title owner sought reimbursement under L. 1891, c. 6. The matter there determined, as stated by the court, may well be restated here (50 Minn. 497, 52 N. W. 971):

"The relator, under the existing law, was entitled to a refundment of his money, as were all other purchasers at the sale, in case the judgment under which he purchased was adjudged void. In addition to this right, common to all purchasers, he was in a position, no redemption being made, to secure property rights of more or less value, depending upon what had theretofore been paid to the state. That he did not ultimately secure all that he might have had, because he omitted to make proper application and payment to the state auditor, cast no more of an obligation or duty upon the county or upon the state to reimburse him

than would have been cast had be allowed other tax-sale certificates to supersede those held by him. By his own default he lost the amount of his investments; not by reason of any neglect or omission of the county officers. By means of the act of 1891, the legislature simply appropriated funds already in the county treasury to a private purpose, in which neither county nor state had· any interest, and in respect to which there existed no obligation, legal, equitable, or moral, upon either county or state. * * * We are obliged to hold that, in so far as they relate to school lands, the provisions of Laws 1891, ch. 6, are unconstitutional and void."

The state was concerned during the time it was in the business of providing funds as a lender of money to secure such loans in the manner and form related. That business, including the resulting obligations going with it, was on its face an entirely different one from that involved in the cited case. We hold that the state also takes these lands subject to taxes accruing during private ownership and until the purchaser's title is divested.

3. Inasmuch as ditch liens are specifically mentioned in the act as having priority, we can see no escape from their being and remaining such liens upon the lands thus specially benefited by such improvement. The state takes such lands subject to ditch liens.

The demurrer should have been sustained, and the order overruling it is reversed.