STATE EX REL. COMMON SCHOOL DISTRICT NO. 15, PEN-
NINGTON COUNTY, v. OLE SAGENG AND OTHERS.[1]

February 20, 1931.

No. 28,292.

*Henry N. Benson,* Attorney General, and *H. B. Sherwood,* Assistant Attorney General, for appellants.

*Theodore Quale,* for respondent.

STONE, J.

Plaintiff, a common school district of Pennington county, seeks mandamus against defendants as members of the rural credits bureau. They appeal, on a certificate of importance and doubt, from an order overruling their general demurrer to the petition of plaintiff and the alternative writ issued pursuant thereto.

■ The mandamus wanted is one to compel the bureau to pay plaintiff the "special aid" authorized by L. 1929, p. 315, c. 265, entitled: "An act providing aid to certain school districts and appropriating money therefor out of the rural credit expense fund."

Section 1 of the act is as follows:

[1] Reported in 235 N. W. 380.

"Whenever in any school district the state since January 1, 1924, has acquired or may hereafter acquire title to real property by foreclosure of rural credits mortgages or in entire or partial discharge of any such mortgage, such school district shall be entitled to receive from the state, in addition to all other state aid, such an amount annually as would be produced by a tax at the rate for local school purposes for the last preceding year upon the valuation of such property in said district so held by the state as fixed by the last assessment thereof."

Under § 4 the state board of education determines whether a school district is entitled to aid, and if any is due, the amount is certified to the department of rural credits. There follows a mandate that as soon as practicable the amount so determined shall be paid "out of the Rural Credit Expense Fund in the same manner as other expenses of said department are paid." So much of said fund as may be necessary was appropriated for the purposes of the act, "not exceeding $40,000 annually." Should the total amount of such aid in any fiscal year exceed $40,000, there is a provision for a ratable distribution of that sum among the school districts entitled to the aid.

Section 7 reads as follows:

"Payment of aid hereunder shall discharge to that extent any taxes which may have been levied against such land for local school purposes for such district for the year ending on December 31 preceding the beginning of the fiscal year for which such aid is paid, and no land upon which the local school taxes for such year have been paid shall be included in calculating the aid to which any such school district shall be entitled hereunder."

The "Rural Credit Expense Fund," out of which was to come the aid for the school districts in lieu of taxes under § 4 of the 1929 law, is the fund designated by § 7 of the law of 1923, creating the bureau, as the "Reserve Fund." Concerning that fund the statute provides [L. 1923, p. 246, c. 225, § 7]:

"The Bureau shall determine the proportion of interest collected upon loans which shall be used for operating expenses, which shall

be, as near as practicable, the difference between the interest paid by the state for money borrowed on its bonds and the interest paid by the borrower. The interest set apart for such purpose shall be credited to a Reserve Fund, as shall also the repayment of any sums originally disbursed therefrom as a part of the Bureau's administrative expenses. All administrative expenses shall be paid out of the Reserve Fund and all other disbursements shall be made out of the Rural Credits Fund."

The demurrer is grounded upon the proposition that the attempt to appropriate a portion of the reserve fund for the aid of school districts in the manner stated is beyond the constitutional competence of the legislature. That position we sustain for the following reasons.

Our former constitutional policy that state credit should "never be given or loaned" for private purposes was modified by amendment in 1922 so as to authorize "a system of rural credits" for the purpose of developing the agricultural resources of the state. Art. 9, § 10. Pursuant to that authority, the bureau was organized under L. 1923, p. 246, c. 225. Because of § 19 of that act, and for the other reasons stated in In re Delinquent Real Estate Taxes, Polk County, 182 Minn. 437, 234 N. W. 691, lands acquired for the state by the bureau are not now subject to taxation. Doubtless it was in anticipation of that result that the law of 1929 was enacted to reimburse school districts for revenues lost through the immunity from taxation of the foreclosed lands of the bureau.

The bar to any appropriation by the legislature out of the funds of the bureau for the purpose of aid to school districts is found in this prohibition of art. 9, § 8, of the state constitution:

"The money arising from any loan made, or debt or liability contracted, shall be applied to the object specified in the act authorizing such debt or liability, or to the repayment of such debt or liability, and to no other purpose whatever."

With that should be read the part of § 5 of the article to the effect that every debt of the state secured by bonds "shall be authorized by law, for some single object, to be distinctly specified therein."

The query now is whether it is an unconstitutional diversion thereof to use any of the interest on rural credit loans for the aid of school districts as attempted by the law of 1929. The most plausible argument in justification is that, inasmuch as the state is the owner of the lands foreclosed by the bureau (in respect to which the school districts have been deprived of their usual tax revenue) it is a matter of ordinary business that it should pay taxes on them or special aid in lieu of taxes. If it could do so, the argument concludes, the outlay should be considered an item of expense as taxes are in any ordinary business.

But the state is not in a position of an ordinary business. Because of its ownership of the lands they are simply not now subject to taxation. Hence there is no tax outlay, and clearly none was contemplated by the laws establishing the rural credits system.

The purposes to which the interest revenues of the bureau were to be devoted were plainly indicated by the law of 1923. The creation and maintenance of the bureau was first provided for. The payment of the interest on rural credit bonds and certificates of indebtedness was made a first charge upon its revenue. (§§ 7 and 12.) The repayment of the $200,000 appropriation from general revenue was provided for. (§ 16.) Nothing in the act, and certainly nothing in the constitutional amendment of 1922, indicated that any of the revenues could be diverted to the aid of school districts or other municipalities.

Counties are suffering in their revenues in the same manner as are school districts by reason of the disappearance from the tax rolls of foreclosed lands of the bureau. If there is constitutional authority for aid to school districts out of the funds of the bureau there is as much for similar aid to counties. It was the plain purpose of art. 9, § 8, of the constitution to prohibit such a diversion of moneys from "the object specified in the act authorizing" the debt or liability. To hold that interest from rural credit loans can be diverted to school district aid would in effect make the reserve fund of the bureau a part of the state's general revenue subject to appropriation for any public purpose. If that were done, the loadings on rural credit funds could be so increased as to compel

the bureau to charge farmer borrowers a rate of interest equal to or even greater than that demanded by private capital. That would defeat the whole purpose of the rural credit system and the constitutional amendment authorizing it.

Permeating the whole scheme and implicit all through the act creating it is the purpose that so far as possible it should be self-supporting. Only the capital investment was to come through the issue of bonds except for the initial appropriation from general revenue of $200,000 and the moneys gotten from tax levy certificates issued pursuant to § 12 (the latter to be paid from the proceeds of the next bond issue). The bureau was to be financed solely from the interest on its loans. The purposes to which rural credit revenues were thereby devoted, irrevocably under the constitution, were those then enumerated. Necessarily they were exclusive. They could not be enlarged later so as to include purposes not within the purview of the original law authorizing the borrowing and the reloaning of the money borrowed. That would be a violation of the constitutional requirement that the money be applied exclusively "to the object specified in the act authorizing" the debt or liability, which was to appropriate such revenues irrevocably to the purposes first designated by the legislature. Such a designation made, the bond issue once authorized and its purposes stated, "no other purpose whatever" can later be made the beneficiary of any of the resulting revenue, at least while any of the state's indebtedness for the purpose in question remains outstanding.

We defer as much as we may to the legislative declaration that the school aid attempted by the law of 1929 should be paid as an expense of the bureau. But we must be governed not by what anyone calls the thing but by what it is in real substance. The title of the act is frank and enlightening. It is *"an act providing aid to certain school districts and appropriating money therefor out of the rural credit expense fund."* Frankly therefore it seems to impose a new and substantial charge on rural credits income, one not within the scope of the original act. That cannot be done, no matter who calls the new burden a mere expense.

A plausible argument is made that the constitutional restriction upon the use of "money arising from any loan made" to the state reaches only the use of the fund borrowed and excludes interest received if the state reloans the money. But that, we think, gives a too limited scope to the constitutional prohibition. When one borrows money he acquires temporary additional capital. If he puts it into ordinary business and makes a profit, the latter in a very real and equally ordinary sense is "money arising from" the original loan. That conclusion loses logical justification only as the borrowed capital is aided by such factors as good management, previously existing good will, or mere good fortune. But if the borrowed money is simply reloaned at increased interest, the resulting gain to the original borrower is surely "money arising from" the new capital loaned him.

If it had been the intention of the framers of our constitution to include in the inhibition of art. 9, § 8, and protect from diversion only the money borrowed, nothing more than the original proceeds of state bonds, they would have said so in plain language. The phrase "money arising from any loan made" has a much broader coverage than the words, principal sum borrowed, proceeds of a loan, or other language of similar import restricted to what is first realized by a borrower as distinguished from the fund borrowed plus profits made by reloaning it.

■ We do not overlook the reference, in argument, to the fact that there may remain in the reserve fund of the bureau some of the original appropriation of $200,000 from general revenue. The question whether general revenue may be appropriated as aid to school districts or counties in lieu of the taxes which otherwise would be collected on these foreclosed lands is not before us. The attempted appropriation now considered is not confined to general revenue which may perchance be in the rural credits reserve fund.

Neither the unobjectionable character of what has been done pursuant to a statute nor the possibility that future action thereunder may not transgress constitutional limitations will save the act if it clearly authorizes a violation of fundamental written law. Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. ed. 220. "The

constitutionality of an act must be tested" not by what has actually been done by its authority but by the power it actually gives. Replogle v. Little Rock, 166 Ark. 617, 267 S. W. 353, 36 A. L. R. 1333. Statutes must be construed in the light of their "general future application and operation, and not with reference to conditions existing at any particular time." State v. Canada C. C. Co. 85 Minn. 457, 462, 89 N. W. 66, 68.

The order appealed from must be reversed.

So ordered.

OLSEN, J. (dissenting).

I dissent.