## ARTHUR NAFTALIN v. STAFFORD KING.

102 N. W. (2d) 301.

April 1, 1960—No. 37,968.

*Hugh H. Barber,* for appellant.

*Miles Lord,* Attorney General, *Robert M. Mattson,* Deputy Attorney General, and *John R. Murphy,* Special Assistant Attorney General, for respondent.

FRANK T. GALLAGHER, JUSTICE.

This is an appeal from a judgment entered pursuant to plaintiff's motion for judgment on the pleadings.

By Ex. Sess. L. 1959, c. 90, the legislature appropriated from the Minnesota State Building Fund to the commissioner of administration $38,049,982; to the commissioner of conservation $487,480; and to the regents of the University of Minnesota $14,457,150; making an aggregate, including reappropriations, of $52,994,612. Such appropriations are by specific items stating the location, institution, and particular purpose of each expenditure.

■ The question now presented is the constitutionality of c. 90, which was determined in the affirmative by the district court. This court was confronted with the precise issue now before us in Naftalin v. King, 252 Minn. 381, 90 N. W. (2d) 185. There we decided that a state indebtedness is not created within the meaning of Minn. Const. art. 9, § § 5, 6, and 7, where certificates of indebtedness are authorized and issued pursuant to a legislative act which makes them exclusively payable from a special fund, the proceeds of which are derived from the levy and collection of a tax authorized for that particular purpose. It is our opinion that the same rule should be used in the instant case.

■ In State ex rel. Foster v. Naftalin, 246 Minn. 181, 210, 74 N. W. (2d) 249, 267, with respect to the rule of stare decisis we stated:

"* * * It is true that stare decisis does not apply with the same strictness in some fields of law as in others. In the field of real estate or property law, for instance, it is applied with the greatest force for the reason that in those fields property rights may have become vested in reliance upon our decision. However, it is not inapplicable in any field. Before decisions of this court should be overruled or ignored in subsequent cases, there should be some good reason for doing so. That is particularly true of decisions construing our constitution. Where such decisions have stood unchallenged for many years they should not be lightly overruled."

In that case the doctrine of stare decisis was applied even in view of the fact that no business or property rights were involved which would be impaired by the application of the rule. We stated (246 Minn. 205, 74 N. W. [2d] 264):

"* * * Government by law instead of by man, which is the main bulwark to our democratic form of government, demands a decent respect for the rule of stare decisis in order that citizens of this state will be assured that decisions of the court are good for more than 'one trip and one day only.' "

The rule of stare decisis is not an inflexible rule of law. It is a guiding policy of the law when all factors involved in following or not following the rule are taken into consideration. 17 Dunnell, Dig. (3 ed.) § 8819. Whether or not the rule of stare decisis should be followed is a question entirely within the discretion of the court which is again called upon to consider a question once decided. Hertz v. Woodman, 218 U. S. 205, 212, 30 S. Ct. 621, 622, 54 L. ed. 1001, 1005; Park v. Employment Security Comm. 355 Mich. 103, 94 N. W. (2d) 407.

In view of the fact that the applicability of the doctrine of stare decisis is discretionary with the court, we must consider the factors here involved. In the present case the appropriations, including reappropriations, from the Minnesota State Building Fund involved a total of $52,994,612. This amount is for the construction, alteration, repair, and rehabilitation of various state hospitals—the Minnesota State Sanatorium; Brainerd, Cambridge, and Faribault state schools and hospitals; Ramsey County Preventorium; Braille and Sight Saving School; School for the Deaf at Faribault; Gillette State Hospital for Crippled Children; and the Owatonna State School. In addition the appropriation includes funds to be used in connection with the state reformatories for men and women, state prison, training schools for boys and girls, various youth camps, and the Minnesota Youth Treatment Center. Also funds for use at the five state colleges; the University of Minnesota; and other appropriations for the Capitol group of buildings, land acquisitions, parks, and contingencies.

It might appear at first glance that no vested rights would be impaired by reversing our former decision of Naftalin v. King, *supra,* and holding c. 90 unconstitutional. However, the complaint in this action indicates that the State Board of Investment has agreed to purchase $3,300,000 of the certificates of indebtedness issued pursuant to

c. 90. Assuming that this allegation is correct inasmuch as there is no denial, then it would appear that vested rights would be impaired by holding c. 90 unconstitutional. Also, although not involving vested rights, certainly the reliance upon our former decision as reflected by the legislature in passing c. 90 would be impaired.

If we failed to follow Naftalin v. King, *supra,* in connection with c. 90 at this time, the construction, alterations, repairs, and rehabilitation of the various state buildings referred to above would be curtailed and chaos, delay, hardship, and confusion might well result. To tie up the state building program by declaring that the $52,994,612 cannot be made available will create a problem which in our opinion would be far more serious than is now recognized by the public. It can produce hardship in our mental institutions which are already crying for relief; it can retard educational development and progress and cause unnecessary delay in meeting a situation which must be faced before a constitutional amendment can be submitted and approved. After all, a majority of both houses of the 1959 legislature passed c. 90, now under consideration, even though the house and senate did not get together on the matter of submitting the constitutional amendment. The final vote on c. 90, after being submitted to a Conference Committee, was 57 yeas and 5 nays in the senate (Journal of the Senate, 1959, p. 2535), and 71 yeas and 50 nays in the house (Journal of the House, 1959, Ex. Sess., p. 774).

We are not disregarding the fact that a close examination of the decisions upon which the previous Naftalin v. King case was decided indicates that they were decided upon fallacious reasoning. Brown v. Ringdal, 109 Minn. 6, 122 N. W. 469, which was relied on in Naftalin v. King, *supra,* was in turn resolved by following, as controlling, Fleckten v. Lamberton, 69 Minn. 187, 72 N. W. 65. The Fleckten case did not involve the validity of bonds or certificates of indebtedness payable out of general ad valorem taxes spread over a number of years in the future. The clear language of the opinion is that an indebtedness could not be incurred beyond the constitutional limit. The Brown case, on the other hand, did involve the issuance of certificates of indebtedness in anticipation of the collection of a tax

thereby directed to be levied. The opinion stated, we believe erroneously, that (109 Minn. 12, 122 N. W. 470) "The certificates in and of themselves create no indebtedness against the state. * * * and they are not general obligations of the state."

The Naftalin case, although relying on the Brown case, established a proposition relative to certificates of indebtedness which are to be retired from a state building fund, to which fund is appropriated moneys derived from a levy upon all the taxable property in the state. It established that such certificates when once issued are irrevocable obligations of the state and, until paid, pledge the credit of the state toward their repayment out of general ad valorem taxes levied against all the property of the state.

It follows logically from this that the issuance of such certificates creates a debt within the meaning of Minn. Const. art. 9, § 5, and to the extent that such amount exceeds $250,000, it is a violation of that provision.

Nevertheless, the Brown case was followed in Naftalin v. King, *supra,* which was decided largely because of the prior decisions of long standing.

As previously stated, the application of the doctrine of stare decisis is within the discretion of the court. It should be just as discretionary for the court to follow stare decisis as not to follow the doctrine. It therefore appears that stare decisis, in a given case, should be followed where less injustice will result from the continuation, as under the circumstances here, of an erroneous theory, than will follow from its correction. Also, that the exercise of our discretion in applying the doctrine of stare decisis should not necessarily be restricted to cases where vested contract rights pursuant to contract are involved. State ex rel. Foster v. Naftalin, 246 Minn. 181, 74 N. W. (2d) 249. In the exercise of discretion to invoke the doctrine of stare decisis, we base our opinion primarily on the reliance that has been placed upon the holding in our former Naftalin v. King decision, and on the delay and confusion which could result by the curtailment of that part of the building program provided for in Ex. Sess. L. 1959, c. 90, in the event our former decision were not followed in this case.

We do not believe that our decision could declare c. 90 constitutional and at the same time prospectively declare unconstitutional—with binding effect—similar laws which might be passed in the future pledging the credit of the state as security. However, considered dicta can be expressed which would in the future eliminate the primary reason for now adhering to stare decisis and holding Ex. Sess. L. 1959, c. 90, constitutional. It is true that obiter dicta cannot bind future decisions of courts. However, where dicta are found in an opinion which are *considered* dicta and not merely in the nature of passing comment, they should not be ignored and are even entitled to great weight. In Goodson v. United States (D. Minn.) 151 F. Supp. 416, 420, the court utilized this principle in determining local law, stating:

"* * * 'Any convincing manifestation of local law, having a clear root in judicial conscience and responsibility, whether resting in direct expression or obvious implication and inference, should accordingly be given appropriate heed'. * * *

"The dicta we have considered here are dicta which the Minnesota court considered, and, therefore, they are entitled to great weight and should be followed unless it can be shown that there is good reason why the Minnesota court would not follow them when presented with the issue."

In a footnote in our 1958 decision of Naftalin v. King, *supra,* we said that largely because of our prior decisions of long standing we were holding that the building certificates of indebtedness authorized by the 1955 and 1957 acts did not contravene Minn. Const. art. 9, §§ 5, 6, and 7, however, that it was the opinion of all the members of the court at that time that a word of caution as to future state finances was in order.

To the extent that dicta may be binding, and to the extent to which others may rely on the instant decision in passing laws similar to Ex. Sess. L. 1959, c. 90, it is our opinion now that if this court is again presented with the issue in connection with future laws pledging the credit of the state as security such laws should be declared in violation of Minn. Const. art. 9, §§ 5, 6, and 7.

Affirmed.

NELSON, JUSTICE (concurring specially).

I concur in the majority opinion on the basis of the rule of stare decisis.

KNUTSON, JUSTICE (dissenting).

I dissent.

The majority admits that the act under consideration contravenes Minn. Const. art. 9, § 5, but refuses to declare the act unconstitutional. They say, after considering some of the facts involved in the case and the decisions upon which they rest their opinion:

"It follows logically from this that the issuance of such certificates creates a debt within the meaning of Minn. Const. art. 9, § 5, and to the extent that such amount exceeds $250,000, it is a violation of that provision."

I refuse to join in the type of reasoning that permits an admitted unconstitutional act to be called constitutional by the simple process of ignoring what we know to be right. In effect, what the majority say is that we know that the act under consideration is unconstitutional but we will not say so now, and by way of dicta they say that we hope this court in the future will have the courage to declare similar acts unconstitutional. I think that we should have the courage to declare our convictions now, no matter how unpopular it may be to do so.

In order to justify the position taken by the majority, they seek comfort in State ex rel. Foster v. Naftalin, 246 Minn. 181, 74 N. W. (2d) 249, even though two members of the present majority dissented in that case, and imply, by quoting portions of the opinion in that case completely out of context, that these two cases are similar when even a cursory examination of that case and this discloses a complete dissimilarity. In the first place, in the Foster case we had under consideration a rule of construction for determining the constitutionality of a bill, not an interpretation of the language used in our constitution. Then again, as we pointed out in that case, we had theretofore at least twice, and possibly three times, completely reconsidered the entire matter and practically all the authorities submitted in support of the contention that we should overrule our former decisions. Here we have

blindly followed a decision which all members of this court now admit is wrong without any prior reexamination of the soundness of prior decisions. In the third place, the rule followed in the Foster case was supported by many reputable courts of other jurisdictions. Here we stand alone[1] in calling an obligation that is admittedly a state debt something else as a subterfuge for continuing to ignore the plain meaning of language used in our constitution. The majority, as well as the dissenters, recognize that the language used in the constitution does not mean what we continue to say that it means.

In view of the public importance of the issues involved, I think that the time has come for a complete reexamination of the whole matter and a frank declaration of the law according to our constitution as we believe it to be. It seems to me that it is our sworn duty to do no less.

In order to effectively accomplish this purpose I think that it is necessary to state the facts more fully than has been done in the majority opinion.

This appeal involves the constitutionality of Ex. Sess. L. 1959, c. 90, and particularly § 14, subd. 2, thereof. For all practical purposes, the scheme of financing involved is the same as that discussed in Naftalin v. King, 252 Minn. 381, 90 N. W. (2d) 185, and, except in so far as it is necessary for a disposition of this appeal, the facts therein stated will not be repeated.

Under Ex. Sess. L. 1959, c. 90, the legislature appropriated from the Minnesota State Building Fund to the commissioner of administration $38,049,982; to the commissioner of conservation $487,480; and to the regents of the University of Minnesota $14,457,150, making an aggregate, including reappropriations, of $52,994,612. Under the act, such appropriations, by specific items, are allocated to certain purposes specified in the appropriation.

Under the act (§ 14, subd. 1), taxes are levied on all real and personal property in the state sufficient to produce $52,022,280, to

---

[1]For annotations on the question here involved, see 92 A. L. R. 1299 and 134 A. L. R. 1399.

be spread on the tax rolls for the years 1959 to 1978 so as to produce $2,601,000 in each of the years 1960 to 1979, plus additional amounts for interest on certificates issued pursuant to the act. Provision is also made that in case of a deficiency in such levy for any year the auditor shall levy sufficient additional amounts in succeeding years to compensate therefor.

Section 14, subd. 2, which is more particularly involved here, provides for the issuance and sale of "state building certificates of 1959-1978" to be issued upon certification of the commissioner of administration that funds are needed for the purposes so authorized, not exceeding $52,022,280. Subd. 2 contains the following pertinent language:

"* * * Such certificates shall be numbered consecutively and shall be issued and sold at not less than par upon sealed bids after two week's published notice, unless sold to the state board of investment, which may invest any funds under its control or direction in any such certificates of indebtedness so issued and to purchase such certificates, notwithstanding any limitations imposed by Minnesota Statutes 1957, section 11.10 or any other law inconsistent herewith, at such rate of interest as it may determine. Such certificates and the interest coupons attached thereto when issued shall have all the qualities of negotiable instruments and shall be incontestable in the hands of a bona fide holder thereof of value notwithstanding any provisions in Minnesota Statutes 1957, chapter 335, to the contrary. Such certificates shall be in such sum and of such denomination and shall mature at such times as the state auditor shall determine, not exceeding the time when funds shall be available for the payment thereof from the tax levies herein authorized. Such certificates shall bear such rate of interest, payable semi-annually, and shall contain such other terms and provisions not inconsistent herewith, as the state auditor may require. Such certificates shall be signed by the state treasurer and attested by the state auditor under their official seals and the state auditor and the state treasurer shall keep records thereof. Such certificates shall be a charge against the taxes herein authorized. The principal and interest of such certificates shall be payable from the proceeds of such taxes, and so

much thereof as may be necessary is hereby appropriated for such payments, provided that such interest as may become due at any time when there is not on hand a sufficient amount from the proceeds of such taxes to pay the same, shall be paid out of the general revenue fund in the state treasury, and the amount necessary therefor is hereby appropriated, to be reimbursed from the proceeds of such taxes when received."

Section 14, subd 1, reads:

"For the purpose of providing funds appropriated by this act, there is hereby levied upon all the taxable property in this state, including, notwithstanding the provisions of Minnesota Statutes 1957, section 273.13, subdivisions 6 and 7, as amended, all real property used for the purposes of a homestead, a tax sufficient to produce $52,022,280 which the state auditor shall cause to be extended and collected in the manner in which other state taxes upon real and personal property are extended and collected, to be included in the levies spread upon the tax rolls for the years 1959-1978, inclusive, in amounts sufficient to produce the sum of $2,601,000 in each of the years 1960 to 1979, inclusive, plus additional amounts sufficient to produce such sums as may be necessary to pay the interest upon certificates of indebtedness issued pursuant to the provisions of this act. The proceeds of such tax levies and of the sale of certificates of indebtedness issued hereunder shall be credited to the Minnesota state building fund. In case of a deficiency of such tax levy for any year, the auditor shall levy sufficient additional amounts in succeeding years to compensate therefor until the full amount herein authorized has been raised. The moneys in the Minnesota state building fund are hereby appropriated for the purposes herein specified."

It is apparent that the certificates of indebtedness issued pursuant to § 14, subd. 2, are payable out of taxes levied pursuant to § 14, subd. 1.

Plaintiff, commissioner of administration, has certified to defendant, the state auditor, that funds appropriated for his department are presently needed in the amount of $5,000,000 for the purposes specified in the act and has requested defendant to issue and sell such state

building certificates of 1959-1978 pursuant to Ex. Sess. L. 1959, c. 90, § 14, subd. 2, as will produce that amount and to credit said amount, when received, to the Minnesota State Building Fund. Defendant has informed plaintiff that he has been advised and believes that if he should issue and sell the building certificates he would be doing so contrary to Minn. Const. art. 9, §§ 5 and 6, and that such action would be contrary to his oath of office. As a consequence, this action was brought for a declaratory judgment to determine the constitutionality of Ex. Sess. L. 1959, c. 90.

The trial court granted plaintiff's motion for judgment on the pleadings upholding the constitutionality of the act, and this appeal followed.

The only argument presented by plaintiff, and the only basis for affirmance, is that stare decisis furnishes justification therefor, it being the contention that, inasmuch as we upheld the constitutionality of a similar act in Naftalin v. King, 252 Minn. 381, 90 N. W. (2d) 185, we must now follow that decision and uphold the constitutionality of Ex. Sess. L. 1959, c. 90.

It is true that on essentially the same facts we upheld the constitutionality of the act involved in Naftalin v. King, *supra.* In so doing, without reexamining prior decisions, we said (252 Minn. 386, 90 N. W. [2d] 190):

"Despite defendant's able and persuasive argument—which might well prevail if the present court were passing on the issue for the first time—we find no justification for now overruling the longstanding special-fund rule of the Brown decision * * *."

At the same time we added a footnote in which we said (252 Minn. 387, 90 N. W. [2d] 190):

"Although, largely because of our prior decisions of long standing, we definitely hold that the building certificates of indebtedness authorized by the 1955 and 1957 acts do not contravene Minn. Const. art. 9, §§ 5, 6, and 7, it is the opinion of all members of the court that a word of caution as to future state financing is in order. As forcefully pointed out in Brunk v. City of Des Moines, 228 Iowa 287, 291 N. W. 395, 134 A. L. R. 1391, the special-fund type of

financing may be so abused that it becomes merely a subterfuge for evading the purpose of constitutional state debt limitations. A constitutional provision which has become so outmoded that only an ever-increasing application of legal ingenuity makes it workable in meeting the modern needs of state finance should be amended. The abuse of the special-fund doctrine has become apparent to many authorities."

While courts are and should be reluctant to overrule former decisions except in cases where they are clearly wrong, the doctrine of stare decisis, under our law, is intended to serve as a guide in future decisions in order that there might be stability to law, rather than an inexorable rule which must be followed regardless of error in prior decisions. It is not intended as a rule under which former decisions of this court are forever to be perpetuated without reexamination, whether right or wrong. In other words, *the rule is not intended to perpetuate judicial error.* In Park Const. Co. v. Independent School Dist. No. 32, 209 Minn. 182, 187, 296 N. W. 475, 478, 135 A. L. R. 59, 63, 25 Minn. L. Rev. 786, we said:

"No rights of property involved, nor rule of practice, the American doctrine of *stare decisis* is guiding policy, not inflexible rule."

Except in fields where rights of property are vested in reliance upon such decisions, it is often better to correct error when it becomes clear that prior decisions are erroneous than to fortify what was wrong to begin with by additional erroneous decisions. Reexamination of decisions based upon erroneous construction of our constitution should invite the attention of this court even more than reexamination of decisions based upon construction of statutes. In the latter case the legislature may correct the error, but in the former it can be corrected only by the more difficult process of constitutional amendment. In his dissenting opinion in Burnet v. Coronado Oil & Gas Co. 285 U. S. 393, 405, 52 S. Ct. 443, 447, 76 L. ed. 815, 823, Mr. Justice Brandeis said:

"*Stare decisis* is not, like the rule of *res judicata,* a universal, inexorable command. 'The rule of *stare decisis,* though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall

be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided.' Hertz v. Woodman, 218 U. S. 205, 212. *Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. * * * This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. *But in cases involving the* Federal *Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions.* The Court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." (Italics supplied.)

In Park v. Employment Security Comm. 355 Mich. 103, 147, 94 N. W. (2d) 407, 428, Mr. Justice Black in a concurring opinion said:

"* * **stare decisis* is a discretionary rather than obstinate rule of judicial conduct. Fairly analyzed, it declares that *appellate courts should adhere to precedent save only when due consideration leads to firm conviction that the earlier decision or decisions in scrutiny are wrong* as well as unjust, and that more rather than less injustice will flow from perpetuation of that which is found erroneous." (Italics supplied.)

In effect, the majority holds that we now again uphold the constitutionality of the act before us, even though contrary to our constitution, and by dicta attempts to bind the court in the future to do just the opposite and to indicate that future acts of the same kind will not be upheld. Except on the basis of stare decisis, which furnished the prop on which we have heretofore rested decision in these cases without reexamination of the correctness of prior decisions, there is no legal basis for application of such rule. If we are to decide the constitutionality of a legislative act without regard to former decisions, it is imperative that we apply the constitution as it is, divorced from the fiction that by some legal ingenuity we can arrive at a desired result first and

then construe the constitution as we see fit so as to sustain that result. If we are to perform our judicial function, the most important of which is to construe the constitution according to the clear meaning of the language used as we see it, the act now under consideration must be held either to be constitutional or to be unconstitutional according to the language of the constitution. *It cannot be one thing today and another tomorrow.* The language used in these constitutional provisions cannot have two opposite meanings, depending upon the time and conditions under which we decide a case. The proposition advanced must be distinguished from holdings to be found in cases to the effect that the constitutionality of an act may be determined without setting aside or affecting acts done in reliance on prior holdings. Determination of the constitutionality of the present act has prospective effect only. No action has as yet been taken or rights fixed under c. 90, § 14, subd. 2.

Reliance is placed by plaintiff on cases such as Sunburst Oil & Refining Co. v. G. N. Ry. Co. 91 Mont. 216, 7 P. (2d) 927, affirmed, G. N. Ry. Co. v. Sunburst Oil & Refining Co. 287 U. S. 358, 53 S. Ct. 145, 77 L. ed. 360, but that decision and others like it do not support a rule that we can now hold this act constitutional for the purpose of accomplishing what it was intended to accomplish and hold that similar acts in the future will be unconstitutional. What was actually held by the United States Supreme Court in the above case is that (287 U. S. 364, 53 S. Ct. 148, 77 L. ed. 366)—

"* * * A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions,"

or (287 U. S. 365, 53 S. Ct. 148, 77 L. ed. 366)—

"* * * On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning."

Hoven v. McCarthy Brothers Co. 163 Minn. 339, 204 N. W. 29, is cited in support of the first quoted statement above. It is apparent that we therein adopted the philosophy set forth in that opinion, where we said (163 Minn. 341, 204 N. W. 30):

"It is the law that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation—the overruled decision is regarded in law as never having been the law, but the law as given in the later case is regarded as having been the law even at the date of the erroneous decision, except that where a constitution or statute has received a given construction by the court of last resort and contracts have been made and rights acquired in accordance therewith, such contracts may not be invalidated nor vested rights acquired under them impaired by a change of construction made by a subsequent decision."[2]

In view of the juristic philosophy which we have adopted as set forth in this case, it is difficult to see how we can now hold that the act before us is constitutional today and will be unconstitutional in the future. If, when overruling former decisions, we are to adhere to the rule that former decisions are to be regarded as never having been the law, except as to contracts made or rights acquired thereunder, how can we hold that an act is constitutional now and that in the future the same act will be unconstitutional with any degree of consistency.

The correct rule, I think, has been expressed by this court on a number of occasions. In Bowe v. City of St. Paul, 70 Minn. 341, 345, 73 N. W. 184, 185, we said:

"* * * The act cannot be constitutional to-day and unconstitutional to-morrow. If it may in the future become unconstitutional, it is so when passed."

In State ex rel. Common School Dist. No. 15 v. Sageng, 182 Minn. 565, 570, 235 N. W. 380, 383, we said:

---

[2]For discussions as to the effect of overruling former decisions, see Carpenter, *Court Decisions and the Common Law,* 17 Col. L. Rev. 593; Freeman, *The Protection Afforded Against the Retroactive Operation of an Overruling Decision,* 18 Col. L. Rev. 230; Note, 29 Harv. L. Rev. 80.

"Neither the unobjectionable character of what has been done pursuant to a statute nor the possibility that future action thereunder may not transgress constitutional limitations will save the act if it clearly authorizes a violation of fundamental written law. Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. ed. 220. *'The constitutionality of an act must be tested' not by what has actually been done by its authority but by the power it actually gives.* Replogle v. Little Rock, 166 Ark. 617, 267 S. W. 353, 36 A. L. R. 1333. Statutes must be construed in the light of their 'general future application and operation, and not with reference to conditions existing at any particular time.' State v. Canda C. C. Co. 85 Minn. 457, 462, 89 N. W. 66, 68." (Italics supplied.)

In 17 Dunnell, Dig. (3 ed.) § 8933, we find the rule stated thus:

"A statute must be construed with reference to its general operation, and not with reference to conditions existing at any particular time. *It cannot be constitutional at one time and not at another. If it may become unconstitutional in the future it is unconstiutional when passed.*" (Italics supplied.)

The possibility of holding that this act is constitutional but that others in the future will not be was considered in an article entitled *Stare Decisis in Courts of Last Resort* by Robert von Moschzisker, 37 Harv. L. Rev. 409, 426, where the author said:

"A solution which has been suggested is that, in the overruling case, instead of simply departing from the law as originally announced, the court adhere to it in adjudging the particular issue for decision, but, at the same time, lay down a new rule to apply prospectively after a certain date. Such a method would not only be plain and outright legislation by the courts, but must prove quite ineffective as a practical remedy, since parties would, in all probability, be unwilling to attack by litigation points already settled when a new ruling would alter the law only prospectively and could not be applied to their dispute. Furthermore, our judicial system would have to undergo a decidedly questionable change before judges would be willing to apply one rule of law to the case before them, and lay down an opposite one by which they

and their successors should be bound in the future. Under our existing system the latter attempted ruling could be nothing more than *dicta*. Courts can correct their own mistakes and, in so doing, they, of course, incidentally affect what theretofore were accepted as settled rules of action, but it is not their office to make law avowedly to cover future cases; hence they cannot deliberately lay down a rule one way to govern a given set of circumstances in the litigated case and a different way to control like cases which may subsequently come before them."

Nor can it be said that expediency justifies the action now taken. The legislature was fully cognizant of the doubtful constitutionality of this type of financing. At the 1959 session of our legislature, House File 387 was introduced on February 2, 1959, and read for the first time.[3] This bill proposed "an amendment to the Constitution of Minnesota relating to the state debt and state debt financing; amending and revising Article IX, Section 5, thereof."[4] The bill was referred to the committee on appropriations. As far as appears from the Journal of the House, it remained there until the session of the

---

[3]See, Journal of the House, 1959, p. 211.

[4]The pertinent portion of this bill read:

"For the purpose of defraying extraordinary expenditures, the state may contract public debts, but such debts shall never, in the aggregate, including all bonds, certificates, warrants, temporary financing loans, or other obligations or evidences of obligation of any type whatever, exceed the total sum of $250,000,000 unless an excess loan, which would raise the total aggregate state debt above this amount, is specifically authorized by a majority of the electorate voting on the question at a special or general election authorized by law; every such debt shall be authorized by law, for some single object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the legislature, to be recorded by yeas and nays on the journals of each house respectively; and every such law shall levy a tax annually sufficient to pay the annual interest of such debt, and also a tax sufficient to pay the principal of such debt within ten years from the final passage of such law, and shall specially appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation and taxes shall not be repealed, postponed, or diminished, until the principal and interest of such debt shall have been wholly paid."

legislature adjourned. A companion bill, Senate File 585,[5] was introduced in the senate on February 18. It was read for the first time and referred to the committee on judiciary.[6] On April 20 it was reported back by the committee with the recommendation that it be amended by striking everything after the enacting clause and substituting in lieu thereof a new version of the bill[7] and that, when so amended, it be passed.[8] The amendment and report thereupon were adopted, and the bill was given its second reading.[9] It was placed on special orders.[10] An attempt was made to further amend the bill, which failed.[11] The bill was then put to a vote and was passed by the senate by a vote of 53 in favor and 8 against.[12] It was then sent to the house, where it was read for the first time on April 20 and referred to the committee on rules.[13] There it apparently remained until the session adjourned.

---

[5]This bill was identical with House File 387.

[6]Journal of the Senate, 1959, p. 316.

[7]The pertinent portion of the proposed amended bill read:

"For the purpose of defraying expenditures, the state may contract public debts, exclusive of all short term borrowing, which is debt repayable within one year of the date it is incurred, and exclusive of all borrowing for highway purposes authorized by this constitution, but public debts shall never, in the aggregate, exceed three hundred million dollars; provided, that the debt limit established by this section can be raised by a two-thirds vote of the members of each branch of the legislature; every such debt shall be authorized by law, for some object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by the majority vote of the members of each branch of the legislature, to be recorded by yeas and nays on the journals of each house respectively; * * *." Thereafter the amended bill provided for the levy of a tax sufficient to pay the principal and interest of such debt.

[8]Journal of the Senate, 1959, p. 1603.

[9]Journal of the Senate, 1959, p. 1616.

[10]Journal of the Senate, 1959, p. 1740.

[11]Journal of the Senate, 1959, p. 1876.

[12]Journal of the Senate, 1959, p. 1876.

[13]Journal of the House, 1959, p. 2484.

With these observations in mind, I proceed to a reexamination of the question of whether the type of financing here involved does or does not constitute an indebtedness of the state so as to contravene Minn. Const. art. 9, §§ 5, 6, and 7.

Minn. Const. art. 9, § 5, as far as here material, reads:

"For the purpose of defraying extraordinary expenditures, the state may contract public debts, but such debts shall never, in the aggregate, exceed two hundred and fifty thousand dollars; every such debt shall be authorized by law, for some single object, to be distinctly specified therein; and no such law shall take effect until it shall have been passed by the vote of two-thirds of the members of each branch of the legislature, to be recorded by yeas and nays on the journals of each house respectively; and every such law shall levy a tax annually sufficient to pay the annual interest of such debt, and also a tax sufficient to pay the principal of such debt within ten years from the final passage of such law, and shall specially appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation and taxes shall not be repealed, postponed, or diminished, until the principal and interest of such debt shall have been wholly paid."

Section 6 provides:

"All debts authorized by the preceding section shall be contracted by loan on State bonds of amounts not less than five hundred dollars each on interest, payable within ten years after the final passage of the law authorizing such debt; and such bonds shall not be sold by the State under par. A correct registry of all such bonds shall be kept by the treasurer, in numerical order, so as always to exhibit the number and amount unpaid and to whom severally made payable."

Section 7 provides:

"The State shall never contract any public debt, unless in time of war, to repel invasion or suppress insurrection, except in the cases and in the manner provided in the fifth and sixth sections of this article."

It must be admitted, I believe, that, if the certificates of indebtedness authorized by Ex. Sess. L. 1959, c. 90, § 14, subd. 2, create a

debt within the meaning of these constitutional provisions, they cannot be upheld. I think that the majority in this decision are the only ones who would quarrel with that proposition. The constitution does not define what is a debt. Webster's New International Dictionary (2 ed.) (1947) p. 678, says that a debt is that which is due from another. It is universally held, I think, that, as applied to a state or municipal obligation, any obligation payable out of general or ad valorem taxes is a debt. See, 11 Wd. & Phr. (Perm. ed.) pp. 188 to 311.

It is obvious that the correctness of our prior decisions rests upon a determination of whether Brown v. Ringdal, 109 Minn. 6, 122 N. W. 469, is legally sound. All subsequent decisions construing the type of financing here involved are based on the assumption that the legality thereof was finally determined in the Brown case. Each subsequent decision has been used to bolster the Brown case, but if that case is legally untenable the whole fabric of our prior decisions is destroyed. Brown v. Ringdal, *supra,* in turn, was based on the assumption that this question had been determined in Fleckten v. Lamberton, 69 Minn. 187, 72 N. W. 65. We said in the Brown case (109 Minn. 12, 122 N. W. 470):

"* * * whatever might be the view of the court as now constituted, were the question a new one, a majority of the present members are of opinion that it was settled adversely to plaintiff's contention by the decision in Fleckten v. Lamberton, 69 Minn. 187, 72 N. W. 65, which we follow and apply.

*       *       *       *       *

"Our conclusion, therefore, is that the validity of this act is sustained by the Lamberton case, and we follow and apply it."

It is therefore necessary to examine these two decisions closely in order to determine whether we properly construed the Fleckten case when we presumed to follow it in Brown v. Ringdal, *supra.*

It seems clear to me that Fleckten v. Lamberton, *supra,* did not decide the question presented in Brown v. Ringdal, *supra,* and subsequent cases, including Naftalin v. King, 252 Minn. 381, 90 N. W. (2d) 185. The Fleckten case involved a construction of L. 1893, c.

2, which, after providing for the appointment of a board which should select a site in St. Paul for the erection of a new capitol building, purchase the same, and erect thereon such new building, provided (§ 7):

"There shall be transferred in each of the years 1893 and 1894 from the general fund to the credit of the board of state capitol commissioners the sum of five thousand dollars, and in each succeeding year after the year of 1894 until the completion of said capitol building, not exceeding ten years, a sum equal to the proceeds of a levy of two-tenths of a mill upon the assessed valuation of the state, for the purchase of a site, or part thereof, and the erection and completion of a new capitol building, in accordance with the terms and provisions of this act; provided that the total amount so transferred shall not exceed the sum of two millions of dollars."

The questions presented for determination were pointed out by this court in paragraph 1 of that opinion, where we said (69 Minn. 189, 72 N. W. 65):

"The position of counsel for appellants seems to be that the constitution prohibits the building of a state capitol *with surplus revenues now in the state treasury, or with funds to be raised by taxation during the time the capitol is being built, and applied directly to that purpose,* and that it can only be built with the proceeds of bonds issued for that purpose. The expense of building a state capitol is not an ordinary, but an extraordinary, expense, within the meaning of sections 2, 5, 6, 7 and 8 of article 9 of the constitution, and counsel cites these sections as authority for his position." (Italics supplied.)

Thereafter in our opinion were set forth the constitutional provisions involved, whereupon we said (69 Minn. 190, 72 N. W. 66):

"It seems to us that the object of these sections is to compel the legislature to provide sufficient yearly revenue to meet the current, ordinary expenses of the state government, and thereby prevent the accumulation of indebtedness for such expenses, and to prohibit the incurring of indebtedness, even for extraordinary expenses, except to a limited extent, and under restrictions and provisions which will insure

prompt and certain repayment. *The object is to prevent the legislature from mortaging the future at all for ordinary expenses, and to prevent it from mortgaging the future for extraordinary expenses, except to a limited extent, and in a restricted manner. There is nothing in these sections which limits the amount of taxes which may be levied, or the amount of funds which may be accumulated in the state treasury, or the amount of extraordinary expenses or disbursements which may be paid out of such funds or out of the revenues as they are collected, provided no indebtedness is incurred which cannot be defrayed by the current revenues.* While these provisions of the constitution declare that the annual revenues shall be as great as the annual ordinary expenses, they do not imply that such revenues, though raised by taxation, may not be greater than such expenses, or great enough to defray in ten years the extraordinary expense of building a state capitol." (Italics supplied.)

It is apparent that the Fleckten case did not involve the validity of bonds or certificates of indebtedness payable out of general or ad valorem taxes spread over a number of years in the future. In effect, what we held was that the state capitol could be built and paid for as the building progressed from surplus revenues in the state treasury or from funds to be raised by taxation during the time the capitol was being built. Actually, what we held was that the capitol could be built and paid for as the building went along. The clear language of the opinion is that an indebtedness could not be incurred beyond the constitutional limit.

When we came to Brown v. Ringdal, *supra,* a different situation was involved. That case involved the constitutionality of L. 1909, c. 27, providing for the construction of a new state prison at Stillwater and, among other things, it provided for the raising of funds by the issuance and sale, as funds were needed, of certificates of indebtedness. The difference between the two cases was pointed out in our opinion in that case where we said (109 Minn. 12, 122 N. W. 470):

"* * * The act under consideration is conceded by counsel for plaintiff, for all practical purposes, identical with the one there held valid, *except that this act provides for the issuance of certificates of*

*indebtedness* in anticipation of the collection of the tax thereby directed to be levied, to be negotiated as therein provided, whereas the state capitol act contained no such provision." (Italics supplied.)

The fallacy of the reasoning in the Brown case, we think, is found in this statement (109 Minn. 12, 122 N. W. 470):

"The certificates in and of themselves create no indebtedness against the state. On the contrary, they are mere evidence of the holder's right to demand and receive from the state treasurer the proceeds of the tax authorized by the act to be levied and collected, and known and classified as the Prison Building Fund. Fairly construed, the act contemplates their payment from this fund exclusively, and *they are not general obligations of the state.*" (Italics supplied.)

With respect to the obligation of the state to honor these certificates of indebtedness, we said (109 Minn. 13, 122 N. W. 470):

"We need not stop to consider whether a subsequent legislature could rightfully repeal this act, and thus leave outstanding certificates issued thereunder, and so impair the faith and credit of the state."

The doubt expressed in the last quoted statement was effectively answered in Naftalin v. King, 252 Minn. 381, 389, 90 N. W. (2d) 185, 191, where we said:

"* * * Once the state, pursuant to a legislative act, has exercised its power and entered upon a contract, as it does when it issues either bonds or certificates of indebtedness under a statute providing for tax levies to be paid into a special fund for their repayment, the state, under the contract clauses of the state and the Federal constitutions, cannot impair that contract but is bound to carry out its terms without repealing, postponing, diminishing, or otherwise impairing the tax levies so established for its fulfillment."

It is now apparent that Brown v. Ringdal, *supra,* as construed in Naftalin v. King, *supra,* establishes the proposition that these certificates of indebtedness, when once issued, are irrevocable obligations of the state and, until paid, pledge the credit of the state toward their repayment out of general ad valorem taxes levied against all the property of the state. It is difficult to see how we can longer hold that such

obligation does not create a debt within the meaning of our constitution.

It is probably unfortunate that we have not heretofore undertaken a reexamination of the correctness of Brown v. Ringdal, *supra.* It has been argued, among other things, that we should adhere to that decision, whether right or wrong, in order that the planned building program now under way might proceed. That the debt limitation in our constitution may now be unrealistic in view of present conditions furnishes no excuse for ignoring it. If the constitution needs amendment, the right to bring that about rests exclusively with the people. Neither this court nor the legislature has a right to ignore clear provisions of the constitution. We are bound by our oath of office to support and uphold it as it is. In the hope that the legislature would propose an amendment to be submitted to the people of this state, we did issue a warning in Naftalin v. King, *supra,* that future issues of such certificates of indebtedness might not be approved. The action taken by the legislature is set forth above. I think that we are now compelled to face the issue squarely.

It is apparent to me, and apparently admitted by the majority, that Brown v. Ringdal, *supra,* misconstrued Fleckten v. Lamberton, *supra,* and applied a construction to the constitutional provisions under consideration under an erroneous application of stare decisis that the clear language of the constitution does not permit. Each subsequent erroneous decision, based in turn upon the original error, makes it more difficult to return to that which the constitution obviously requires. The present decision adds still one more case to be overruled in the future. If the object specified in Ex. Sess. L. 1959, c. 90, can be accomplished by financing such as we have here, there is no function of state government that cannot likewise be financed in the same manner, and thus the property of this state will be mortgaged for many years in the future—the very thing the constitution intended to prevent. This type of financing began innocently enough but has now reached such proportions that each succeeding issue of so-called certificates of indebtedness exceeds the other, now running into millions of dollars, *all of which apparently must be approved by this court before*

*any buyer dares purchase them.* We, in turn, are asked to place our stamp of approval on each issue, solely because we have made the mistake of approving a prior issue, knowing full well that what we do is contrary to the language of our constitution. Thus, we are asked to proceed on the theory that each wrong decision adds support to prior error and that what was wrong to begin with has now become right by repetition. Apparently the idea is that if we have enough erroneous decisions the constitution may in that manner become so completely eroded that we need pay no further attention to it. In a note discussing this subject in 23 Minn. L. Rev. 392, the author said:

"The Minnesota constitution, article 9 (especially section 5), places a debt limitation on the state, but the efficacy of this section has, for practical purposes, been emasculated by the Minnesota court's interpretations."

We have no frequent occasions been called upon to consider the question of whether obligations of municipalities or public corporations constitute a debt where they are actually payable out of a special fund.[14] A true special fund is distinguished from the so-called special fund that we now have before us in that the obligations are payable solely out of the proceeds of something other than ad valorem taxes. While recognizing that such obligations do not constitute a debt of the municipality, it must be apparent that, where the credit of the state stands behind such obligations and they are payable out of general ad valorem taxes levied against all the property of the state, they are no

---

[14]Fanning v. University of Minnesota, 183 Minn. 222, 236 N. W. 217 (bonds payable solely out of earnings of dormitories); Williams v. Village of Kenyon, 187 Minn. 161, 244 N. W. 558 (certificates payable solely out of earnings of a light plant); Davies v. Village of Madelia, 205 Minn. 526, 287 N. W. 1, 123 A. L. R. 569 (bonds payable solely out of earnings of light plant); Hendricks v. City of Minneapolis, 207 Minn. 151, 290 N. W. 428 (contract payable solely from proceeds of parking meters); Struble v. Nelson, 217 Minn. 610, 15 N. W. (2d) 101 (revenue warrants payable solely from earnings of waterworks); Otter Tail Power Co. v. Village of Elbow Lake, 234 Minn. 419, 49 N. W. (2d) 197, 27 A. L. R. (2d) 906 (revenue certificates payable solely out of earnings of light plant).

less a debt of the state simply because the proceeds of the taxes are placed in a so-called special fund for the payment of the obligations. The distinction relates rather to the source of the funds from which the obligations are to be paid than the manner in which the payment is to be made.

In Williams v. Village of Kenyon, 187 Minn. 161, 168, 244 N. W. 558, 561, we considered the difference between a true special-fund obligation which does not constitute a debt of the municipality and one which cannot be considered as such and, in so doing, quoted with approval from Garrett v. Swanton, 216 Cal. 220, 229, 13 P. (2d) 725, 729, where the court said:

"* * * Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred."

Where certificates of indebtedness such as we have here bind the credit of the state and are payable out of general ad valorem taxes levied against property in the future, they do constitute a debt of the state and, except to the limited extent provided in Minn. Const. art. 9, § 5, contravene our constitution. Apparently the majority agree. The type of financing that we have here does not constitute a special-fund type of financing at all. It is a special fund in name only. Putting it bluntly, these certificates of indebtedness constitute an irrevocable obligation of the state, payable out of ad valorem taxes levied generally against all the property of the state, and, as such, it can be nothing but a state debt. If such obligations do not constitute a debt within the meaning of our constitution, there is no such thing.

It will furnish little comfort for a taxpayer to know that we say that the obligation to pay these certificates of indebtedness, for the payment of which his property stands as security, is not a debt of the

524

state when he knows that the taxes from which payment is to come in the future encumber his property for the full term of the bond issue.

It is simply senseless to continue to hold that these obligations of the state for the payment of which the credit of the state is pledged, and which are to be paid out of ad valorem taxes levied generally against all the property in the state, do not constitute an indebtedness of the state for the reason that they are paid out of a fund which, in name only, is designated as a special fund. It would be equally valid to say that a mortgage on a taxpayer's property does not constitute a debt simply because part of it is to be paid in the future in installments. In determining the net worth of an individual or corporation, no financial institution would be impressed with such argument. Courts should not close their eyes to that which is generally known to everyone else.

It is interesting to note the experience of Iowa in connection with a determination of the validity of this type of financing. In Swanson v. City of Ottumwa, 118 Iowa 161, 91 N. W. 1048, 59 L. R. A. 620 (decided October 25, 1902), an action was brought by a resident to enjoin the issuance of certain bonds by the city of Ottumwa, which it was claimed was contrary to the debt limit of the Iowa constitution. The Iowa Supreme Court upheld the validity of the bonds, holding that they were not an indebtedness of the city. On exactly the same facts, an action was brought by a nonresident in Federal court to enjoin the issuance of the same bonds. The Federal court refused to follow the decision of the Iowa court. In that case many of the contentions were advanced that have been urged upon us. Among other things, the Federal court, City of Ottumwa v. City Water Supply Co. (8 Cir.) 119 F. 315, 320, 59 L. R. A. 604, 613 (decided November 26, 1902), said:

"* * * The mixing of water rent surplus with the 'sinking fund' means nothing, as, in addition to the water rents, an annual tax of five mills is agreed to be levied yearly to provide the annual current expenses of operating the waterworks. The city has no revenue, nor means of raising money, except by levy of taxes. * * * it is contended that by making one levy now of an annual two-mill tax, to be collected of

the taxpayers year by year for 50 years, or till the bonds are paid, and from which fund only they are to be paid, no indebtedness is created, and that the borrowing of the money for which the bonds are negotiated is but a simple method of anticipating for present use the future revenue, which will come from the tax so levied covering the future years. We think the taxpayer in future years will regard this scheme as a subterfuge to deprive him of the protection of the constitution, and that the thought will force itself upon him that a city creates an indebtedness when it borrows money to be paid, with interest, from taxes in the future, whether such taxes are formally levied at one time, covering that future, or yearly, to meet the payments when about to mature."

Almost 38 years later, the Iowa Supreme Court reversed itself in Brunk v. City of Des Moines, 228 Iowa 287, 291 N. W. 395, 134 A. L. R. 1391, overruling its former decision. In commenting upon the Federal decision which refused to follow the former state decision, the court said (228 Iowa 294, 291 N. W. 397, 134 A. L. R. 1395):

"It seems to us that it [the Federal court] completely annihilated the basic philosophy of the so-called 'asset theory' * * *."

Many of the cases involving this question are collected in the later Iowa decision.

Thus, while the easy way out is to hold that what we have done before we must do again even though we are now of the opinion that we have heretofore been wrong, I am now convinced that certificates of indebtedness authorized by Ex. Sess. L. 1959, c. 90, § 14, subd. 2, if issued, will constitute evidence of a state indebtedness; that the law under consideration authorizes issuance of such certificates in amounts that contravene the limit of state debt permitted by our constitution; and that as a result, consistent with our oath of office to uphold the constitution, we are compelled to hold that § 14, subd. 2, is unconstitutional. We need not pass upon other provisions of c. 90 in this case since the only thing involved is whether such certificates may be issued and sold.

DELL, CHIEF JUSTICE (dissenting).

I concur in the dissent of Mr. Justice Knutson.